406 A.2d 263.

FRANK A. CARTER, JR., CHIEF DISCIPLINARY COUNSEL
*vs.* STEPHEN R. WALSH, ESQUIRE.

SEPTEMBER 14, 1979.

PRESENT: BEVILACQUA, C.J., JOSLIN, KELLEHER, AND DORIS, JJ.

KELLEHER, J.   The respondent, Stephen R. Walsh, was admitted to the bar of Rhode Island on October 10, 1952. He is before us on an order to show cause why we should not accept the recommendation of this court's Disciplinary Board (the board) calling for the respondent's suspension from the practice of law. The recommendation follows a hearing by one of the board's hearing panels and the board's acceptance of the panel's report.

The board found that respondent had violated various portions of Rule 47 of the Code of Professional Responsibility in that he engaged in deceitful conduct;[1] neglected a matter entrusted to his care;[2] undertook a matter in which he lacked the necessary competence;[3] and intentionally prejudiced the client's cause.[4]

The facts giving rise to this proceeding are undisputed. On September 10, 1973, 20-year-old Dawn R. Ring died from injuries sustained 2 days earlier when she was struck by a motor vehicle while she was crossing Ocean Road in the town of Narragansett. The operator of the motor vehicle was a New Jersey resident, Lawrence Ewert. The vehicle was covered by a liability insurance policy issued by a Texas insurer, United Services Auto Association. The insurer had been in contact with the deceased's parents and had been discussing with them a possible settlement.

Correspondence from an adjuster indicates that on March 29, 1975, the parents told the adjuster that they were unsure whether they would accept the insurer's offer. Two days later, on March 31, 1975, the adjuster received a telephone call from respondent indicating that he was now representing the parents. An August 27, 1975, memo prepared by the adjuster indicated that respondent had reduced his original $75,000 demand to $70,000 and told the adjuster that "writs" would be issued within the week if the insurer did not increase its original offer.

---

[1] DR 1-102(A)(4).

[2] DR 6-101(A)(3).

[3] DR 6-101(A)(1).

[4] DR 7-101(A)(3).

The deceased's father told the hearing panel that sometime during May or June 1976 respondent had told him that the claim was going to be settled and that the daughter's estate should be probated before the settlement was effectuated so that the proceeds would not be tied up in the deceased's estate. A petition for administration dated June 28, 1976, was filed in the East Providence Probate Court, and within a month the father was appointed administrator.

Later in 1976 the father met a parent of another girl who, along with Dawn, was killed in the September 10, 1973 mishap. At that time the father was told by the other parent that the statute of limitations had expired. The father then spoke with the adjuster and was told that he was "out of luck." When the father confronted respondent and informed him about his "out of luck" status, respondent told his client that there was nothing to worry about because "we still had a case going in the [c]ourt."

On September 27, 1976, respondent wrote to the father and told him: "[P]lease be advised that legal action has been instituted against the party involved in the auto accident involving your daughter." The letter went on to tell the father that respondent was intending to institute a direct suit against the insurer. At that point in time, the parents were looking for other counsel and thinking in terms of a malpractice suit.

The deceit charge was based upon the two September 1976 incidents—the confrontation where the father was told not to worry, and the subsequent letter advising him the suit was pending. Everyone concedes that when these assurances were given, the statute had long since expired. When respondent testified, he stated that in late August 1975 he had drawn up a death-action complaint. He went on to explain that he was then of the opinion that once he had filled out the complaint, even though it never left his briefcase, the statute had been tolled. The respondent acknowledged that this view was erroneous but insisted that he did not discover the error until sometime after September 1976. Thus, he asked the board to believe that his misrepresentations were innocent rather than fraudulent.

It is obvious that the board rejected this defense on credibility grounds. The board's report describes this facet of respondent's testimony as incredible, pointing out that earlier in his testimony respondent had tried to impress the panel by telling of his long experience as a professor of law at a local college, where he teaches law-related subjects to students pursuing a course in Business Administration. Of course, factfinding is the board's prerogative, and we affirm the board's rejection of respondent's innocent-misrepresentation defense.

The respondent's defense of the neglect charges centers about his hospitalization at a time when the statute of limitations was just about to expire. Medical records indicate that he was hospitalized for chest pains following a five-set game of tennis. He was admitted to Rhode Island Hospital on Sunday, September 7, 1975, just 3 days before the statute was to lapse. He was discharged almost 2 weeks later on September 20. He now claims that this sudden and unexpected period of disability excuses his failure to institute suit. This defense further brings into question respondent's credibility.

The respondent would like us and the board to believe that if it were not for the quick trip to the hospital, he would have commenced suit on the following Monday, Tuesday, or Wednesday. This contention is completely at odds with what respondent testified before the hearing panel. As noted before, respondent had insisted that when he had filled out the complaint, he had believed that he had tolled the statute. When he was asked about the initiation of probate proceedings in June 1976, respondent conceded that he did not know that at that time the statute of limitations had expired about 8 months earlier. In fact, he said he was not aware that his filling-out-the-complaint theory did not hold water until he had discussed this matter with his present counsel sometime in the late fall of 1976. When one of the panel members asked respondent if he was worried about the statute's expiring, he replied: "No. I wasn't thinking about that, Mr. Ricci, no, I really wasn't."

Taking respondent's words for what they say, it is obvious to us that his September chest pains offer no excuse for his failure to do what he should have done. We reject what might be called respondent's "sudden emergency" defense and affirm the finding of neglect. Parenthetically, we would add that further evidence of this neglectful attitude can be found from respondent's admission that process was never issued because he was "unsure exactly how to approach this particular matter as far as suing an out-of-state resident."

The competency charge arose while the hearing was in progress. When respondent conceded that he had never handled a death action, an Assistant Disciplinary Counsel moved that the pleadings be amended to include a charge that respondent had agreed to represent a client in an area of the law when he knew or should have known that he was not competent to practice without first associating with a lawyer who had the necessary competence. In making this motion, counsel was relying upon the provisions of DR 6-101(A)(1). However, the ethical considerations which precede DR 6-101 make it clear that an attorney may accept such employment if in good faith he expects to become qualified through study and investigation as long as such preparation would not result in unreasonable delay or expense to his client.

Here, respondent's difficulties do not arise from any ignorance of the intricacies of the wrongful death act. His present difficulties come about not because of a lack of expertise in trying a wrongful-death action or in effectuating a settlement of a wrongful-death claim. Rather, for reasons perhaps best known to himself, he has ignored the simple and direct language of the wrongful death act which states: "[E]very such action shall be commenced within two (2) years after the death of such person." General Laws 1956 (1969 Reenactment) §10-7-2. Had the action been timely commenced, for all we know respondent might have gone on from there and, by diligence and dedication, acquired the necessary knowledge so that he could have well served his client's cause. Consequently, we hold that the violation of DR 6-101(A)(1) was not proved.

The intentional-prejudice finding lacks evidentiary support. Clear and convincing evidence is the standard by which the respondent's conduct is to be measured. *Carter* v. *Folcarelli*, No. 79-40-M.P. (R.I., filed June 20, 1979). The only evidence which would support the finding of intentional prejudice is the September 1976 misstatements about the pendency of the suit. This is the evidence which suggests a willful course of conduct on the respondent's part. However, the fabrications came about a year after the statute had expired, and by then the damage to the Rings had already been done. The board's finding of prejudice is vacated.

The only matter to be resolved is the question of sanction. An attorney who is inattentive to his client's interests and whose candor leaves much to be desired should be disciplined. The board has recommended suspension. While the board's recommendation is entitled to great weight, the ultimate responsibility in this area is with this court.

The touchstone of a court's power to discipline attorneys is to fashion a sanction which fulfills the court's obligation to the public and profession, edifies the bar, and is fair and just to the respondent. *In re Vasser*, 75 N.J. 357, 364, 382 A.2d 1114, 1117 (1978). The severity of the sanction to be imposed is dependent upon the facts and circumstances of each case, and the court may, of course, consider factors in mitigation, such as the attorney's prior professional conduct.

In seeking to select a suitable sanction, we would note that in the early 1960's the respondent served the city of East Providence in various responsible legal positions at a time when that municipality was designated and nationally recognized as an "All-American City." However, 2 years ago in *Ring* v. *Walsh*, 119 R.I. 921, 378 A.2d 1071 (1977, we became aware that the respondent had failed to file a timely response to the Ring malpractice action and was defaulted. Conversations with the respondent at the disciplinary hearing indicate that he has given priority to his pedagogical efforts. It is obvious that he can no longer serve his professional responsibilities in both the law and education with

equal vigor. Consequently, it is hereby ordered that the respondent be and is publicly censured for the neglect and deceit demonstrated in this case, and he is also directed to submit his resignation forthwith from the practice of law in accordance with the provisions of Rule 42-23[5] adopted by this court on September 4, 1979. The respondent is further directed to furnish to the clerk of this court on or before October 1, 1979, the names and addresses of all clients presently represented by him.

Mr. Justice Joslin participated in the decision but retired prior to its publication. Mr. Justice Weisberger did not participate.

*Alan S. Flink*, for petitioner.

*Charles H. McLaughlin*, for respondent.

## APPENDIX
### Rule 42-23

Any individual who desires to resign from membership in the Bar of this state shall file a motion requesting the same with the Clerk of the Court. If the Clerk reports that the movant is a member in good standing and that there are no complaints pending, the motion will be granted as a matter of course.

Anyone whose resignation is accepted shall remain subject to the Supreme Court's disciplinary jurisdiction in proceedings for any misconduct committed while a member of the Bar.

All resignees shall, for a period of 5 years following the acceptance of their resignation, file the statements of registration presently required by Rule 45 of attorneys who have discontinued the practice of law in this jurisdiction.

---

[5]See Appendix.

If a resigned member desires reinstatement, he or she shall proceed as provided for in Rule 42-16.

Entered as an order of this court this 4th day of September 1979.

Bevilacqua, C.J.
Kelleher, J.
Doris, J.
Weisberger, J.