**In the Matter of A Member of the Bar of the Supreme Court of the State of Delaware: J. Kai LASSEN, Respondent.**

**No. 72, 1994.**

Supreme Court of Delaware.

Submitted: Nov. 21, 1995.
Decided: Feb. 22, 1996.

Charles S. Crompton, Jr. (argued), and Joanne Ceballos, Potter, Anderson & Corroon, Wilmington, for Respondent.

David Curtis Glebe, Chief Disciplinary Counsel, Wilmington, for Office of Disciplinary Counsel.

Before VEASEY, C.J., WALSH, HARTNETT and BERGER, JJ., and RIDGELY, President Judge,[1] constituting the Court *en Banc.*

PER CURIAM:

This matter is before the Court pursuant to Rule 9(e) of the Rules of the Board on Professional Responsibility. Respondent, J. Kai Lassen ("Lassen" or "Respondent"), is a member of the Bar of this Court who was admitted to practice in 1971 and is now 53 years of age. Respondent seeks review of the Final Report (the "Final Report") of the Board on Professional Responsibility (the "Board")[2] dated August 11, 1995.[3] In the Final Report, the Board unanimously found Respondent to have violated eight rules of the Delaware Lawyers' Rules of Professional Conduct (the "DLRPC"). A majority of the Board rejected a proposed sanction consisting of a private admonition conditioned on voluntary, permanent retirement from the practice of law in Delaware and elsewhere (the "Permanent Retirement Sanction"), and recommended a three-year public suspension. The dissenting Board member, however, recommended that the Court adopt the proposed Permanent Retirement Sanction. A review of the Board's findings and the determination of the appropriate sanction is now before this Court.

Respondent challenges the Board's findings concerning the violations and the Board's conclusion that a private admonition would be inappropriate in view of the Permanent Retirement Sanction. For the reasons set forth below, we sustain the Board's finding that Respondent violated eight rules of the DLRPC. We determine that a public reprimand and suspension from the practice of law for a period of three years is the appropriate sanction in this case. In light of this, we have determined that: (a) under the circumstances, the sanction imposed in this case must be of a public nature; (b) Respondent's voluntary proffer of the Permanent Retirement Sanction conditioned on anonymity must, therefore, be rejected; and (c) only this resolution appropriately advances the policies of effective regulation of the Bar. In consideration of Respondent's voluntary withdrawal from the practice of law commencing on December 31, 1991, however, the Respondent will be credited as having served the durational requirement of this suspension and will be eligible for reinstatement upon his compliance with the conditions enumerated at the end of this Opinion.

## I. FACTS

On January 21, 1992, partners of a Delaware law firm (the "Firm"), pursuant to their duty under DLRPC 8.3(a), reported several ethical violations by Respondent, a Firm partner, to the Office of Disciplinary Counsel ("ODC"). The circumstances surrounding these violations resulted in Respondent's voluntary resignation from the Firm.[4]

On December 30, 1992, the ODC filed with the Board a petition for discipline (the "petition"), which included allegations that Re-

---

**1.** Sitting by designation pursuant to Del. Const., art. IV, § 12, and Supr.Ct.R. 2.

**2.** The Board is an agency of this Court. Supr. Ct.R. 62; *In re Kennedy*, Del.Supr., 472 A.2d 1317, 1318–19, *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984).

**3.** Lassen initially sought review of a report dated March 3, 1994 (the "1994 Report") issued by the Board on Professional Responsibility (the "Board"). In that Report, the Board found that Respondent violated eight rules of the Delaware Lawyers' Rules of Professional Conduct (the "DLRPC"). The Board recommended that imposition of a private admonition would be inap-

propriate, and rejected Respondent's offer to retire permanently from the practice of law (the "Permanent Retirement Sanction") on the condition of a private admonition. The Board did not, however, recommend any particular sanction. This Court reviewed the 1994 Report and remanded the matter to the Board for further findings. *In re Lassen*, Del.Supr., No. 72, 1994, Veasey, C.J. (Jan. 17, 1995) (ORDER). Upon remand, the Board has satisfactorily addressed all issues raised in the January 17, 1995 Order.

**4.** Respondent is not now practicing law, but he is still a member of the Bar.

spondent violated the following rules of the DLRPC: 1.5(a), 3.3(a)(1), 3.3(a)(4), 3.4(b), 4.1(a), 5.3(c)(1), 8.4(b), 8.4(c), and 8.4(d). The Board held a hearing on May 25, 1995.[5] At the hearing, the ODC relied exclusively on *certain stipulated facts* (the "stipulated facts") to form its case.[6] In addition to Respondent, three witnesses—a Firm partner, a partner from another firm (the "Prior Firm") of which Respondent had previously been a member, and Respondent's treating psychologist—testified on Respondent's behalf. The relevant stipulated facts before the Board and this Court are as follows:

1. The Respondent is a member of the Bar of the Supreme Court of the State of Delaware, having been admitted to practice in 1971.

2. At all times relevant to the Petition, Respondent was engaged in the private practice of law in the State of Delaware as one of the partners of a law firm (the "Firm").

3. Respondent withdrew as a member of the Firm effective December 31, 1991.

4. On several occasions between October 13, 1990 and February 14, 1991, Respondent used the Firm's credit card at various restaurants to charge meals totaling $262.18 that were not related to the business of the Firm nor properly chargeable to any of the Firm's clients (the "Personal Restaurant Charges").

5. On several occasions between October 13, 1990, and February 14, 1991, Respondent directed the Firm's accounting and bookkeeping personnel to designate the Personal Restaurant Charges as billable to certain of the Firm's clients.

6. On some occasions between October 13, 1990, and February 14, 1991, Respondent directed the Firm's accounting and

bookkeeping personnel to combine the Personal Restaurant Charges with various other legitimate costs typically billed to the firm's clients (e.g. "photocopies"), such that the Personal Restaurant Charges would then be re-designated on the clients' bills as "delivery charges", "photocopies", "telephone charges", or "travel expenses".

7. In December 1990, Respondent approved $1,354.93 of false charges (which includes the $262.18 of Personal Restaurant Charges) to be billed to at least three of the Firm's clients.

8. In April of 1991, Respondent sent bills for a portion of the $1,354.93 of false charges (i.e., the $262.18 of Personal Restaurant Charges) to at least one of the Firm's clients.

9. In April of 1991, after the Firm's partners had discussed with Respondent the impropriety of some of the false charges in three client matters in which the client had not yet been sent a bill, Respondent agreed not to send a bill to those clients for such amounts, but to have the amounts charged instead against his capital account at the firm.

10. In October of 1991, Respondent signed, under oath, a pleading entitled "Joint Application by Attorneys for Equity Security Holders Committee for Interim Compensation and Reimbursement of Expenses" (the "Fee Application"), attached to which was an itemization of the Firm's fee and expense charges containing a false charge of $131.75 for personal restaurant meals.

11. The Fee Application was filed with the United States Bankruptcy Court for the District of Arizona in November of 1991 in the case of *In re: Reddington/El*

---

**5.** The Board's initial hearing was held on June 15, 1993. In light of this Court's remand of the matter, the Board held a new hearing on May 25, 1995. For purposes of our review of the Board's Report, only the findings and conclusions contained in the Final Report are relevant. *See supra* n. 3.

**6.** In the initial hearing, Respondent stipulated to the relevant facts. In so stipulating, Respondent reserved the right to withdraw his stipulation if the Board rejected the Permanent Retirement Sanction and to file a new answer in which he

could raise a complete defense against the charges. In its Order remanding this case to the Board, *In re Lassen*, Del.Supr., No. 72, 1994, Veasey, C.J. (Jan. 17, 1995) (ORDER), this Court determined that a conditional stipulation of facts was inappropriate and directed Respondent to either remove the condition attached to the stipulation or withdraw the stipulation entirely. Lassen chose to remove the condition attached to the stipulation of facts. The factual record before us is, therefore, not subject to dispute.

*Conquistador Limited Partnership,* Case No. 87–0917–TUC–RTB, and was approved by the order of the Court on December 23, 1991.

12. In at least four client matters (the "Four Client Matters") in which Respondent was the "billing attorney" at the firm, and which were being billed on an hourly-rate basis, Respondent reported in his time records for the Firm that he had spent substantial amounts of his professional time working on such matters when in fact the Respondent had not performed the work so recorded.

13. With respect to the Four Client Matters, Respondent billed clients in those matters for the following amounts of his professional time purportedly worked on such matters when in fact the Respondent had not performed such work.

A. *Case 86330*—From December, 1986 to March, 1991, the total amount of allegedly improper time charges was approximately 150 hours billed in the amount of $18,125.

B. *Case 90208*—From July, 1990 to March, 1991, the total amount of allegedly improper time charges was approximately 60 hours billed in the amount of $9,469.

C. *Case 90134*—From April, 1990 to February, 1991, the total amount of allegedly improper time charges was approximately 40.6 hours billed in the amount of $6,090.

D. *Case 89119*—From June, 1989 to November, 1990, the total amount of allegedly improper time charges billed was in the amount of $4,500.

14. The voluminous records of the Firm reflecting the time charges in paragraphs 12 and 13 also contain at least 90 instances where other members of the Firm show conferences with Respondent, while his records show no corresponding time entry. In addition, there are at least 65 instances in those time records where one lawyer or paralegal other than Respondent reported a conference with another Firm employee whose time record does not show a corresponding entry to corroborate these conferences.

15. Except for Respondent, none of the Firm's partners has ever been asked to resign from the Firm because of matters pertaining to the billing of clients or the keeping of time records.

In summary, the facts before this Court show that Respondent: (a) submitted to clients and to the bankruptcy court as disbursements personal charges totaling $1,486.68; (b) attempted to disguise those charges; (c) improperly attempted to charge to clients in "at least" four matters fictitious hourly billings totaling $38,184; and (d) entered other questionable billable hours on firm records. The facts also show that neither the Firm nor any client suffered any financial loss as a result of Respondent's misconduct.

In addition, Respondent resigned in 1982 from the Prior Firm and received a private censure from the Board, due to unethical billing practices. According to the previously confidential record on file in this Court in connection with the 1982 matter, Respondent, while at the Prior Firm, overbilled several clients, and charged other clients with certain expense account items unrelated to their interests. Respondent, however, made full reimbursement to all involved parties. Specifically, the record of the 1982 matter shows that on August 4, 1982, the Board sent Lassen a private censure for violations of certain ethical rules then in effect: DR 1–102(A)(4), DR 1–102(A)(6) and DR 2–106(B) of the Code of Professional Responsibility. According to the Preliminary Report of July 21, 1982, upon which the private censure was based, the facts were set forth in a letter from Lassen's counsel:

During a period from late August 1981 through December 1981 (when his domestic problems were in the very process of being resolved and his new relationship beginning) Kai [Lassen] billed a client with whom he had an on-going involvement for 114.25 hours of his time for which current services had not been rendered. While Kai had an on-going involvement with the client, he had no involvement with the specific matter which was billed. It had been his intention to make up this time to the client when his personal situation sta-

bilized. The client has been informed of the billing and discussions have been had as to appropriate adjustment.

At the same time, that client was charged with certain expense account items which were so tenuously related to that client's interest that Kai and I have concluded, after careful examination, that the rationalization for those charges was improper. As a result of that determination, Kai has concluded that the client should be reimbursed for all such dubious charges immediately. Two of the charges were never billed to the client, and Kai has delivered to me his check to his firm to reimburse it for those disbursements. Additionally, Kai has deposited in my escrow account $1,500 which more than reimburses his firm for all questionable expense account items. The client's account has been fully credited with respect to this reimbursement.

The Preliminary Report of the member of the Board assigned to that matter, upon which report the private censure appears to have been based, concluded as follows:

> Mr. Lassen's own account shows that he was in violation of DR1–102(A)(4) and (6). These provisions provide respectively that:
>
> "(A) A lawyer shall not:
>
> (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; and
>
> (6) Engage in any other conduct that adversely reflects on his fitness to practice law."
>
> Also, I find that Mr. Lassen was in violation of DR2–106(B) in that he did charge an excessive fee, i.e., one for which there was no basis in fact.
>
> On the other hand, it is my belief that while Mr. Lassen knew his conduct to be wrongful, he had no intention of defrauding the firm's client on a long-term basis

and did intend to make up the time to the client when his personal situation had cleared up. I also find that once confronted with his wrongful conduct, Mr. Lassen has accepted full responsibility for that conduct, has expressed his shame and embarrassment, voluntarily resigned from his firm at considerable financial sacrifice and has brought the matter to the attention of the Board on Professional Responsibility himself. In addition, I find that no member of the public has actually been injured by his conduct; that the member of the public affected by his conduct "has no further interest in the matter"; ...

In response to the remand Order issued by this Court in the current matter now before the Court, the parties stipulated to the following additional facts: [7]

1. The Respondent's admission and stipulation of facts (the "Stipulation of Facts"), by which the Respondent admits the factual allegations of the Petition, except that he denies that he acted with the requisite intent to find a violation of any of the DLRPC and further denies that the requisite intent may be inferred from the admitted facts, is not conditioned upon the decision of the Board or the Court as to the appropriate sanction, if any, to be imposed upon the Respondent.

2. Respondent's prior disciplinary record was adequately disclosed to the Board before it issued its ... [1994] Report....

. . . . .

4. Since January 1, 1995, Mr. Lassen has been employed on a full time basis as Executive Vice–President of Krapfcandoit, Co., a Delaware construction and development company. That company was one of Mr. Lassen's clients before he voluntarily withdrew from the practice of law. Krapfcandoit, Co. was one of the four

---

[7] In its remand Order, the Court requested, *inter alia*, that the Board determine whether Respondent's counsel, Charles S. Crompton, Esq., was subject to a conflict of interest requiring his withdrawal from the case. The potential conflict arose from the fact that Mr. Crompton was Chairman of the Board in 1982 when Respondent received a private admonition. The Board found that "[t]here has been no violation of

DLRPC 1.12(a) as a result of Mr. Crompton's representation of the Respondent in this case and his participation in the Respondent's 1982 disciplinary proceeding as Chairman. Final Report at 9. The parties do not contest this finding of the Board. We hold that this finding is supported by substantial evidence and represents a proper application of the relevant rules of law.

clients cited in the complaint filed by his former partners in this proceeding. . . .

Though stipulating to the above facts, Respondent denied violating the DLRPC, arguing that the conduct currently before the Court was not "done knowingly or intentionally to obtain any improper or unreasonable fee, to obtain any personal benefit at the expense of any other person, or with any fraudulent or illegal intent." Alternatively, Respondent urged the Board to recommend a sanction consisting of a private admonition conditioned on the Permanent Retirement Sanction, which prohibits Respondent from ever again engaging in the practice of law in Delaware and elsewhere.

## II. THE BOARD'S REPORT

In its Report, the Board concluded as follows:

1. The ... stipulated and admitted facts are established by clear and convincing evidence. Although throughout the hearing the Respondent's position has been that he believed the charges for both the restaurant expenses and the hours worked were accurate, the Board understands that the Respondent's position is not intended to withdraw his stipulation or admission of those facts, and that his admission of these facts is unconditional. . . .

2. The Board finds that there is clear and convincing evidence that the Respondent violated the Rules set forth in Counts One to Nine of the Petition, except for Count Seven. Count Seven charges the commission of criminal acts in violation of Rule 8.4(b), which states that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. The Board finds that there is insufficient evidence to establish the requisite intent to constitute a violation of Rule 8.4(b), and accordingly the charge is dismissed.

The Respondent argues that the Disciplinary Counsel has not adduced clear and convincing evidence of intent necessary to establish a violation of any of the Rules set forth in the Counts of the Petition. Disciplinary Counsel argues that a person intends the natural and probable consequences of his acts and, therefore, the requisite intent is presumed from the Respondent's conduct. The Respondent, however, points out that the presumption is rebuttable. The Respondent argues the evidence shows that the Respondent did not intend knowingly or intentionally to make false statements or intend to defraud or to deceive anyone, nor did he act with any motive of personal monetary gain, and, accordingly, the Respondent concludes there is not the requisite clear and convincing evidence of the specific mental state that is a required element for a violation of each of the Rules.

The Board disagrees with the Respondent's position. The evidence adduced at the hearing explains the reason for Respondent's conduct, but does not excuse or justify it. The Board finds that the stipulated and admitted facts are sufficient affirmative evidence of the state of mind requisite for the violations of the Rules charged, other than Rule 8.4(b).

3. A majority of the Board concludes that the Respondent should be disciplined publicly for his conduct and that the imposition of a private admonition, coupled with voluntary permanent retirement is not an appropriate sanction.

The Respondent argues that the retirement sanction is appropriate when analyzed under the American Bar Association Standards for imposing lawyer discipline. Under those standards, the Respondent contends the most severe sanction that would be appropriate is the imposition of a private reprimand, because at most, the evidence with regard to the Respondent's mental state shows that he was negligent and that there were no aggravating factors. The proposed Retirement Sanction, being a permanent prohibition against the practice of law is a more severe punishment than even disbarment, and as the Respondent argues, would serve all of the purposes of lawyer discipline by protecting the interests of the public, deterring the errant lawyer and others from engaging in similar conduct in the future, and preserving confidence in the legal system.

The position of Disciplinary Counsel is that although the Office of Disciplinary Counsel does not agree with the retirement sanction, the sanction is one on which reasonable people might differ. Disciplinary Counsel suggests that the issue is "[D]oes the severity of the retirement sanction (in its requirement of a permanent retirement from the legal profession) *outweigh* the need for disciplinary sanctions to be made public?" (Opening Brief at p. 40 (emphasis in the original)).

A majority of the Board concludes that it is appropriate for the Respondent to be sanctioned publicly and recommends a suspension equal to the time that the Respondent has already voluntarily absented himself from the practice of law.... A majority of the panel has so concluded for the following reasons:

(a) The Board has no authority under the rules to recommend a retirement sanction.... If it is to be imposed in this case, then a majority of the Board feels that it is for the Court to do so.

(b) A majority of the Board doubts whether or not the permanent retirement sanction is enforceable because of its permanent nature.... We have substantial questions whether or not a permanent retirement sanction could pass substantive due process muster....

(c) The Respondent's conduct does not consist of a single occasion of improper charges for meals, a single occasion of directing personnel to hide restaurant charges by disguising them as other office expenses, or a single occasion of over billing. If the Respondent's repeated conduct resulted from negligence, then it *must be considered gross negligence.*

. . . . .

(e) A majority of the panel is also concerned that the Respondent is not [remorseful].... Throughout the original proceedings and at the remand hearing, the Respondent has continued to deny any wrongful intention on his part....

(f) It was also admitted at the hearing that the only reason there was no injury to Respondent's clients, when these restaurant charges were renamed and billed to clients, is because of the intervention of his partners....

(g) The majority of the panel has inferred the necessary intent from the Respondent's conduct to find a violation of the Rules. Even if the panel were unwilling to so infer, we believe that *In the Matter of Figliola,* Del.Supr., 652 A.2d 1071 (1995) is more on point with this case on the matter of sanctions than is [*In re: A Member of the Bar,* Del.Supr., No. 186, 1994, Walsh, J. (Aug. 15, 1994)]....

. . . . .

With respect to misappropriation of clients' property, the Court found that suspension is appropriate in cases of knowing misappropriation, which is what a majority of the panel has inferred here, and that a public reprimand and/or fine is appropriate in instances of negligence. Here, a majority of the panel has concluded that Respondent's conduct constitutes at least gross negligence, and a majority of the panel is willing to infer a wrongful intention.

(h) Moreover, a majority of the panel does not believe that a Respondent in a disciplinary proceeding ought to be able to choose the form of sanction. While an argument is made by Respondent's counsel that voluntary permanent retirement is a more severe sanction than is public reprimand or suspension, one wonders if that is true in Respondent's case, since he has voluntarily chosen the permanent retirement sanction.

(i) Moreover, a majority of the panel is concerned that permitting the Respondent to choose his own sanction, in this case voluntary retirement, will result in an unfortunate precedent that in the future every lawyer facing discipline will choose.

(j) The panel is sympathetic to the Respondent's family, however, we believe that one risk of public life that all public officials face is being brought into Court embarrassed and having their pri-

vacy invaded. No evidence has been adduced before us that makes the Respondent's case any different than any other such public official or lawyer facing discipline.

(k) A majority of the panel feels that it would be improper for the Board to tailor its remedies to the preferences of the very people that it is disciplining without looking at the broader picture. A majority of the panel is also concerned that permitting the Respondent to permanently retire could cause a public perception that disciplined attorneys get to pick their own penalty in the disciplinary process.

For the foregoing reasons, a majority of the panel recommends that the Respondent be suspended effective December 31, 1991 for a period of three years, and that upon a showing by clear and convincing evidence of professional rehabilitation and fitness to practice law and competence, as well as a showing that the resumption of the practice of law will not be detrimental to the administration of justice, then the suspension should be lifted and the Respondent should be reinstated.

## III. FINDINGS AND CONCLUSIONS OF THIS COURT

Respondent argues that the Board failed to find the mental state necessary to prove the eight violations. Alternatively, Respondent contends that, if the Board made such a finding, it is unsupported by the evidence contained in the record. The ODC replies that the Board inferred that Respondent acted purposefully and knowingly, and that the

Board's finding is supported by the record. We agree with the ODC.[8]

[■] In cases charging violations of the DLRPC, this Court independently reviews the Board's findings of fact and conclusions of law. *In re Agostini*, Del.Supr., 632 A.2d 80, 81 (1993). The scope of review is whether the record below contains substantial evidence to support the Board's findings. *Id.; In re Brewster*, Del.Supr., 587 A.2d 1067, 1069 (1991). The Court reviews questions of law *de novo*. *In re Barrett*, Del.Supr., 630 A.2d 652, 656 (1993). This case requires the Court to consider Respondent's contention that the Board erred in finding that Respondent violated the pertinent eight rules. We conclude that the Board's determinations are sufficiently supported by the record.

[■] We conclude from this record that Respondent knowingly[9] and improperly: (a) made personal restaurant charges to clients' accounts; (b) disguised these charges; (c) made misrepresentations to the bankruptcy court in connection with the misallocation of personal charges to a client's account; and (d) charged fictitious billable hours to clients' accounts.

Accordingly, we agree with the ODC that Respondent violated the following provisions of the DLRPC: 1.5(a) ("[a] lawyer's fee shall be reasonable"); 3.3(a)(1) ("[a] lawyer shall not knowingly ... make a false statement of material fact or law to a tribunal"); 3.3(a)(4) ("[a] lawyer shall not knowingly ... offer evidence that the lawyer knows to be false"); 3.4(b) ("[a] lawyer shall not falsify evidence"); 4.1(a) ("[i]n the course of representing a client a lawyer shall not knowingly ... make a false statement of material fact or law to a

---

**8.** We infer from this record that Respondent's conduct was consistent only with a wrongful intention and is inconsistent with concepts of negligence, even gross negligence. We therefore disagree with that portion of the Board's findings set forth at p. 995, *supra*, which introduced the concept of gross negligence. Nevertheless, we do not disturb the Board's finding that there was insufficient evidence to establish the requisite intent to constitute a violation of Rule 8.4(b), which relates to professional misconduct by committing a criminal act. *Supra* p. 994.

**9.** The rules define "knowingly" as denoting "actual knowledge of the fact in question." DLRPC

Terminology. It is well settled that a person is presumed to have intended the natural consequences of his or her acts, *see, e.g., In re Frabizzio*, Del.Supr., 498 A.2d 1076, 1081 (1985); *In re Morford*, Del.Supr., 80 A.2d 429, 432 (1951), thus, "knowledge may be inferred from the circumstances," DLRPC Terminology; *cf.* 11 *Del.C.* § 307(a) (jury may infer accused's knowledge from his or her conduct); *Whalen v. State*, Del.Supr., 492 A.2d 552, 564 (1985) ("[U]nder Delaware law ... a person is presumed to intend the natural and probable consequences of his [or her] act.").

third person"); 5.3(c)(1) ("a lawyer shall be responsible for conduct of [a nonlawyer employed or retained by or associated with the lawyer] that would be a violation of the [DLRPC] if engaged in by a lawyer[,] if ... the lawyer orders ... the conduct involved"); 8.4(c) ("[i]t is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit or misrepresentation"); and 8.4(d) ("[i]t is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice").

The alleged violations of DLRPC 3.3(a)(1) & (4), 3.4(b) and 8.4(d) stem from Respondent's submission of the fee application to the bankruptcy court. The stipulated facts were the only evidence the ODC presented in support of its allegations. These facts indicate that Respondent improperly submitted personal restaurant expenses totaling $131.75 to the bankruptcy court under oath. Contrary to Respondent's contention, this fact is sufficiently supportive of the Board's conclusion that Respondent violated DLRPC 3.3(a)(1) & (4), 3.4(b) and 8.4(d).

There is a myriad of testimony relating to Respondent's alleged violations of DLRPC 1.5(a), 4.1(a) and 5.3(c)(1). The stipulated facts spell out "at least" four instances where fictitious billable time totaling $38,184 was listed as chargeable to clients' accounts. These billable hours were entered in the Firm's books by or at the request of Respondent. Similarly, the testimony offered at the hearing is consistent with a finding that Respondent acted with the requisite intent. Thus, the Board did not err in concluding that Respondent violated these rules.[10]

The charged violation of DLRPC 8.4(c) is grounded upon Respondent's general misrepresentations to clients regarding the bills and the fee application, as outlined above. Respondent stipulated to the underlying facts relating to the improper billing and the fee application.[11] The Court determines that, based on those stipulations and the other evidence in the record, the Board's finding that Respondent violated DLRPC 8.4(c) is supported by the record.

## IV. THE APPROPRIATE SANCTION UNDER THE UNIQUE CIRCUMSTANCES OF THIS CASE

Respondent contends that application of pertinent guidelines, as delineated in the *ABA Standards*,[12] with or without consideration of the mitigating factors present in this case, would authorize a sanction no greater than a public reprimand. Because the Permanent Retirement Sanction is more severe than a public reprimand, Respondent argues that it must logically suffice as an appropriate sanction. The Board rejected the proffered Permanent Retirement Sanction, concluding that a private admonition would be inappropriate in this case.

### A. Discretion of this Court

■ This Court has exclusive authority and wide latitude in determining disciplinary sanctions over lawyers. *Agostini*, 632 A.2d at 81. While the Board is empowered to recommend a sanction to the Court, it is the ultimate responsibility of this Court to impose sanctions. In the Final Report, a majority of the Board recommended a public, three-year suspension to run concurrently with the Respondent's voluntary withdrawal from practice.

10. Because of the intervention of the Firm in detecting these fictitious billable hours, no client suffered any loss. Respondent willingly cooperated with the Firm in reversing the entries and charges, and in debiting his capital account for the restaurant charges. Respondent and his psychologist offered explanations for his conduct, but these explanations do not excuse the conduct.

11. The Court takes note that disciplinary and criminal problems relating to improper billing practices are unfortunately quite wide-spread. Improper billing practices continue to be a concern to courts and regulatory authorities. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Dresser Indus.*, 4th Cir., No. 91–2238, 1992 WL 189491 (Aug. 10, 1992) (per curiam).

12. *ABA Standards for Imposing Lawyer Sanctions* (1991) (hereinafter *"ABA Standards"*). This Court often relies on the American Bar Association's standards for imposing sanctions to provide guidance in cases involving lawyer discipline. *See, e.g., In re Agostini*, Del.Supr., 632 A.2d 80, 81 (1993).

■ In deciding to accept or reject the Board's recommendation, we recognize that each case is fact-sensitive. "In determining an appropriate sanction, this Court must 'protect the interests of the public and the [B]ar while giving due consideration to the interests of the individual involved.'" *In re Tos*, Del.Supr., 610 A.2d 1370, 1372 (1992) (citation omitted); *see also ABA Standards* Preface (listing such relevant policy considerations as "protecting the public, ensuring the administration of justice, and maintaining the integrity of the profession").

■ The primary purpose of the disciplinary system is "to protect the public." *ABA Standard* 1.1 cmt. As we stated in *In re Tos*, however, "[a]lthough protection of the [public] ... is a primary purpose of disciplinary action, there are other important purposes to be served by lawyer discipline. Disciplinary proceedings also serve to foster public confidence in the Bar, to preserve the integrity of the profession, and to deter other lawyers from similar misconduct." *Tos*, 610 A.2d at 1373 (citing *In re Sullivan*, Del. Supr., 530 A.2d 1115, 1119 (1987)). The United States Supreme Court has recently recognized that preservation of the integrity of the bar and maintenance of the public's perception of the bar are valid objectives of state regulation of attorneys. *Florida Bar v. Went For It, Inc.*, —— U.S. ——, ——, 115 S.Ct. 2371, 2380, 132 L.Ed.2d 541 (1995). Though the Court may consider the deterrent effect of the various proposed sanctions, *Agostini*, 632 A.2d at 81, and *ABA Standard* 1.2 cmt, the lawyer disciplinary system is not penal or punitive in nature, *see, e.g., In re Rich*, Del.Supr., 559 A.2d 1251, 1257 (1989); *In re Bennethum*, Del.Supr., 161 A.2d 229, 236 (1960). Of significant weight in determining the appropriate sanction, however, is the impact the chosen sanction will have on the preservation of the integrity of the Bar and the public's perception of the Bar.

■ The general framework for determining an appropriate sanction for a violation of the DLRPC includes consideration of the following four factors: (i) the nature of the duty violated; (ii) the attorney's mental state; (iii) the actual or potential injury caused by the misconduct; and (iv) the existence of aggravating and mitigating circumstances. *See Agostini*, 632 A.2d at 81 n. 2 (citing *ABA Standard* 3.0). The available sanctions vary in degrees of severity. Suspensions may be imposed for a period of up to three years. Bd.Prof.Resp.R. 8(a)(2); *Barrett*, 630 A.2d at 657 (suspending lawyer for a period of three years). At the end of a suspension period exceeding six months, a lawyer may apply for reinstatement. Bd. Prof.Resp.R. 23(a). Similarly, a disbarred lawyer may apply for reinstatement after five years. Bd.Prof.Resp.R. 23(d). Under either scenario, reinstatement will be allowed only upon a "produc[tion of] clear and convincing evidence of professional rehabilitation, fitness to practice, and competence," *In re Reed*, Del.Supr., 584 A.2d 1207, 1209 (1990) (interpreting Rule 23 of the Rules of the Board on Professional Responsibility) (emphasis omitted), and "that the resumption of the practice of law within Delaware will not be detrimental to the administration of justice[,]" Bd. Prof.Resp.R. 23(f). Lawyers, not originally successful, may reapply for reinstatement. *See In re Clark*, Del.Supr., 406 A.2d 28 (1979) (denying disbarred lawyer's first petition for reinstatement); *In re Clark*, Del.Supr., 430 A.2d 1082 (1981) (denying second petition); *In re Clark*, Del.Supr., No. 170, 1984, McNeilly, J. (Sept. 24, 1984) (ORDER) (denying third petition); *In re Clark*, Del.Supr., 607 A.2d 1230, 1236–37 (1992) (granting fourth petition, but only upon satisfaction of enumerated conditions); *see also Bennethum*, 278 A.2d at 832–834 (granting third reinstatement petition by disbarred lawyer).

■ We conclude that Respondent's conduct, in light of the 1982 private censure, warrants a suspension of three years. Respondent has already voluntarily withdrawn from the practice of law and has not practiced since December 31, 1991, although he has not resigned from the Delaware Bar. Accordingly, the effect of the suspension will be mitigated so that Respondent may apply for reinstatement upon compliance with the conditions of the Judgment of the Court set forth at the end of this Opinion. It would not advance the public's perception and acceptance of the disciplinary system to permit immediate and unconditional reinstatement,

and it would not be fair to Respondent to give him no credit for his voluntary withdrawal from the practice of law. Crediting Respondent with the period of his voluntary withdrawal from practice is an equitable result under the circumstances here, because the durational requirement of a suspension is only one requirement. We agree with the recommendation of the Board that, as a condition of reinstatement, Respondent must show "by clear and convincing evidence . . . professional rehabilitation and fitness to practice law and competence, as well as a showing that the resumption of the practice of law will not be detrimental to the administration of justice." *Supra* p. 995. That showing must include a recognition by Respondent of the wrongfulness of his conduct and appropriate remorse.

### B. Comparison With Other Cases

In determining an appropriate sanction, the Court is guided by its own prior precedent. *Barrett,* 630 A.2d at 656. Involuntary disbarment is not appropriate here in view of all the circumstances, including the Board's finding (which we do not disturb, *see* n. 8, *supra* ) of no violation by Respondent of Rule 8.4(b) relating to criminal conduct. Examples of disbarment cases include the following: *In re Higgins,* Del.Supr., 582 A.2d 929, 932 (1990) (feloniously converting client trust funds); *In re Rich,* 559 A.2d at 1257 (making repeated misrepresentations to clients, substantially neglecting client's interest, conversion of client funds and disregarding court orders); *Sullivan,* 530 A.2d at 1119 (failing to maintain client accounts, violating court order prohibiting his handling of fiduciary funds, commingling and misappropriating client funds and making misrepresentations to court regarding misappropriations); *In re Kennedy,* Del.Supr., 503 A.2d 1198, 1209 (1985) (knowingly using perjured testimony, charging excessive fees, failing to cooperate with disciplinary investigation, and violating court order imposing suspension); and *In re Sanders,* Del.Supr., 498 A.2d 148, 150 (1985) (failing to file state income tax returns for three years).

A mere public reprimand, as in such cases as *In re Williams,* Del.Supr., No. 307, 1989 (August 23, 1989) (failing to maintain client accounts), and *In re Vaughn,* Board Case No. 23, 1988 (Dec. 29, 1989) (representing two clients in same transaction, with conflicting interests), is too lenient here.

Although there is no comparable reported case, *In re Barrett* is relevant. In *Barrett,* 630 A.2d 652, a lawyer (who had already retired after substantial experience for reasons apparently not connected to the disciplinary proceeding) was suspended for three years for negligent failure to account for and deliver proceeds from a wrongful death settlement to a client. *Id.* at 657. The lost proceeds equaled $13,000 and had a present value of $30,000 at the time of the disciplinary proceeding. *Id.* at 656. Although the client was reimbursed by the Lawyers' Fund for Client Protection, this fact did not count in Barrett's favor. In fact, client loss weighed heavily against Barrett. *Id.* at 656–57.

In the instant case, there was no client loss, but the principal aggravating factor is that Respondent's conduct at issue here is in the nature of a repeat offense. As noted above, in 1982 Respondent resigned from his Prior Firm and received a private censure from the Board for unethical billing practices. Other aggravating factors include: substantial experience as a lawyer; refusal to admit the wrongfulness of the conduct at issue; exposure in this case and the 1982 case was as a result of firm scrutiny and action, not Respondent's voluntary admission; and multiple instances of misconduct. *See ABA Standard* 9.22.

Factors tending toward mitigation in this case include: Respondent's timely, good faith effort to rectify the consequences of the misconduct and make restitution; the absence of client harm or loss; full cooperation with the disciplinary authorities and other relevant parties; reputation for good character and professional skill in the legal community; voluntary effort to seek rehabilitation to overcome the awaiting personal challenge; voluntary withdrawal from the practice of law since December 31, 1991; and the impact

of a public reprimand on his wife and young children.[13] *See id.* 9.32.

In light of the above considerations and prior case law, the Court determines that the appropriate sanction is a three-year suspension. The Court approaches the specific issue in this case—whether or not to accept the proffered Permanent Retirement Sanction in lieu of the public, three-year suspension—against the backdrop of the policy considerations discussed above.

### C. The Permanent Retirement Sanction on Condition of Anonymity as an Alternative

■ Whether or not to accept a tendered resignation, as part of or in lieu of a sanction, is solely within this Court's discretion. *Reed,* 429 A.2d at 994. Whether a resignation is accepted "is dependent on the [C]ourt's assessment of the impact that the resignation will have on public policy interests such as the integrity of the legal profession, the administration of justice, and the protection of the public." Lori J. Henkel, Annotation, *Propriety of Attorney's Resignation From Bar in Light of Pending or Potential Disciplinary Action,* 54 A.L.R.4th 264, 278 (1987).

Under the Permanent Retirement Sanction, Respondent would never again be permitted to practice law or to reapply for admission to this Bar or the bar of any other state. That is a significant distinction which differentiates this case from *Clark* or *Bennethum.* The Permanent Retirement Sanction offered here is a sanction that can be imposed only if voluntarily offered. It is not an available involuntary sanction under Board on Professional Responsibility Rule 8 ("Rule 8"). Theoretically, it is more severe than suspension or disbarment. The ques-

tion is whether this sanction should be substituted for a public sanction consisting of a three-year suspension, on condition of anonymity. This question involves important policy considerations and careful balancing.

Rule 8 sets forth the types of sanctions available in a disciplinary action. For purposes of this case, the pertinent ones include disbarment, suspension for a fixed period up to three years, a public reprimand, private admonition, assessment of costs, and limitation on future practice. It is understandable that the Board feels constrained to reject Respondent's proffer of the Permanent Retirement Sanction in exchange for a private admonition. First, the Rules fail to provide specific authorization for such a result. Second, a private "admonition" is not appropriate for one entering permanent retirement. An "admonition" is "a form of non-public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." *ABA Standard* 2.6. Admonition implies advice to correct.[14] This concept does not fit the instant case because it makes no sense to instruct a permanently retired lawyer to correct a fault in his or her practice. Moreover, the serious misconduct here should not receive any sanction which this Court considers a mild rebuke. Respondent contends that he is reluctant to give up the practice of law. He believes that he is a good lawyer and wants to continue practicing law. We assume these facts, *arguendo,* but we infer from this record that the Respondent's offer to retire from the Bar "voluntarily" is a rationalization emanating from the inevitability of a severe sanction, the difficulty of rehabilitating a credible practice and the hope of successfully convincing the Court

---

**13.** The Court is not unmoved by considerations of Respondent's family. The record indicates that Respondent has several children from two separate marriages. It is Respondent, however, who is responsible for the public scrutiny this sanction will bring upon his family. As the Board suggested in its Final Report, public sanction is one of the risks attendant to public life. The Court may not temper its treatment of Respondent to protect the interests of those peripherally affected if to do so would undermine the interests of the lawyer discipline system.

**14.** The following definitions serve as examples of the common use of that term:
 **admonish**—1. to caution, advise, or counsel against something. 2. to reprove or scold, esp. in a mild and good-willed manner: *The teacher admonished him about excessive noise.* 3. to urge to a duty; remind: *to admonish them about their obligations* ....
 **admonition**—1. an act of admonishing. 2. counsel, advice, or caution. 3. a gentle reproof.
 RANDOM HOUSE UNABRIDGED DICTIONARY 26 (2d ed. 1993).

to grant anonymity in exchange for permanent retirement.

An overarching issue here, however, is the impact a private sanction will have on the integrity of the profession, the public's perception of the profession and the credibility of the regulators of the Bar as instruments to control and sanction unethical conduct— and in this case, repeated unethical conduct.

The Permanent Retirement Sanction is a certain way of preventing further wrongdoing by the permanent removal from the practice of law of this apparently healthy, relatively young (53), skilled miscreant. The alternative, a public suspension with Respondent being eligible to seek reinstatement to the Bar of this Court, does not provide the same tenured insulation of the public from Respondent's availability to perform legal services. Nevertheless, the public sanction imposed here will better advance the interests of the lawyer disciplinary system as a whole than anonymity even with permanent retirement. As we stated in *In re Figliola*, "when deciding upon the appropriate sanction the Court must consider that '[t]he primary purpose of disciplinary proceedings is to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct.'" *In re Figliola*, 652 A.2d 1071, 1076 (1995) (quoting *Agostini*, 632 A.2d at 81). Moreover, the public's perception of the legal profession and its ability to regulate itself is essential to the proper functioning of the Bar as a whole, and is quite distinct from the impermissible objective of "punishment." As the United States Supreme Court recently held, "[t]he Bar has [a] substantial interest both in protecting injured [members of the public] ... from invasive conduct by lawyers and in preventing erosion of confidence in the profession that such repeated invasions have engendered." *Went For It, Inc.,* —— U.S. at ——, 115 S.Ct. at 2380.

The *ABA Standards* discuss extensively the propriety of publicly disciplining lawyers who breach ethical obligations. Private admonitions are generally reserved for cases of minor misconduct, when there is little chance of repetition. *Cf. In re Clyne*, Del.Supr., 581 A.2d 1118, 1126 (1990); *ABA Standard* 1.2. In severe instances, as here, public censure is appropriate. The guiding principle in determining whether a sanction should be public or private remains the protection of the public. *See ABA Standard* 1.2. Lawyers naturally want to avoid the public stigma and embarrassment associated with a public sanction, both for their families and themselves. The public at large and the profession as a whole benefit from making public the sanctions imposed in serious cases such as this one. The public benefits because other lawyers are deterred from engaging in misconduct in the future. The profession benefits because such censure fosters the public's knowledge of, and confidence in, the profession's ability to police itself. *Id.* 1.2 cmt.[15] Moreover, anonymity under the circumstances of this case would not be fair to other lawyers who have been publicly sanctioned and suspended.[16] The Court agrees with these general principles and has determined that they are well served by the disposition in this case.[17]

The *ABA Standards* recognize the common practice of private admonitions in certain minor cases.[18] The misconduct here

---

15. *See also* Jan Hoffman, *New Jersey Lawyers' Soiled Linen is Aired for All to See,* N.Y. Times, Dec. 8, 1994, at B1 (noting a change in New Jersey's disciplinary procedures where all lawyer sanctions will be made public hoping that "[t]he candor ... [will] chip away at the public's mistrust of lawyers").

16. *See, e.g., In re Mekler,* Del.Supr., 669 A.2d 655 (1995) (Per Curiam); *In re McCann,* Del.Supr., 669 A.2d 49 (1995) (Per Curiam); *In re Figliola,* Del.Supr., 652 A.2d 1071 (1995); *In re Barrett,* Del.Supr., 630 A.2d 652 (1993).

17. Disciplinary Counsel contends that, since the Court would publicly reveal the circumstances and the sanction with only the name omitted, there would be a substantial likelihood that enterprising investigators would uncover and expose the name in any event. This is a plausible argument, but it is not the determinative one. It is the view of the Court that a public reprimand is appropriate because it is the *right* thing to do for the reasons stated herein, not because any attempted anonymity might fail.

18. The *ABA Standards* state in relevant part:
 In cases of **minor** misconduct, when there is little or no injury to a client, the public, the

certainly is not "minor," and involves a repetition of similar, prior misconduct. A private admonition is inappropriate in this case. Its equivalent, anonymity, is likewise inappropriate, even if the anonymity is coupled with the Permanent Retirement Sanction.

Neither party points to any case that is parallel to the unique circumstances of this case. A number of states have, however, faced the question of whether to accept an individual's retirement from the bar in lieu of disbarment. Most recently, the Supreme Court of Oklahoma disallowed such a retirement because the respondent in that case requested resignation before a full record was available on all pending charges and allegations. *State ex rel. Okla. Bar Ass'n v. Gasaway,* Okla.Supr., 863 P.2d 1189, 1195 (1993); *accord In re Sands,* 86 A.D.2d 96, 449 N.Y.S.2d 219, 220 (1982). The *Gasaway* court found that "[t]he purposes of accepting a resignation during discipline do not include keeping allegations of unprofessional conduct from the Court or secreting the allegations from the public eye." *Gasaway,* 863 P.2d at 1195.

Other cases allowing resignation when the lawyer was subject to disciplinary proceedings include: *In re Hanson,* Minn.Supr., 486 N.W.2d 752, 752–753 (1992); *In re Harper,* Fla.Supr., 84 So.2d 700, 703 (1956); *Florida Bar v. Summers,* Fla.Supr., 197 So.2d 291, 292 (1967); *see also Carter v. Walsh,* 122 R.I. 349, 406 A.2d 263, 265 (1979) (ordering mandatory retirement). Cases where retirement was not permitted to supersede disbarment proceedings include: *In re Coe,* 302 Or. 553, 731 P.2d 1028, 1032–33 (1987); *In re Snyder,*

127 Wis.2d 446, 380 N.W.2d 367, 369 (1986); *In re Peck,* Minn.Supr., 302 N.W.2d 356, 359 (1981); *In re Ditri,* 71 N.J. 173, 364 A.2d 545, 545–46 (1976); *Office of Disciplinary Counsel v. Herrmann,* 475 Pa. 560, 381 A.2d 138, 140 (1977).

The egregiousness of Respondent's misconduct in light of his earlier offense is inexcusable and very disturbing to this Court.[19] To shelter such conduct from the light of public scrutiny does violence to the policies underlying the lawyer disciplinary system and undermines public confidence in the profession which traditionally has been built on trust and self-regulation. Dispensing a nonpublic sanction in this case runs a substantial risk of damaging the reputation of the Bar and the Court with the community at large, and provides an improper message to practitioners that egregious misdeeds may be engaged in without fear of public opprobrium. Moreover, Respondent's proposed result here may result in a dangerous and sometimes unworkable precedent, and would be unfair to other publicly sanctioned lawyers.

Imposition of the Permanent Retirement Sanction may create the appearance that Respondent has been allowed to choose his own sanction, even though it would not be Respondent's unilateral choice because the Court would have to accept the offer. This Court alone is vested with discretion to determine the appropriate sanction to be dispensed in a particular case of attorney misconduct. In this case, a public reprimand is the sanction prescribed by the *ABA Standards. See ABA Standard* 1.2. This is the sanction this Court has prescribed in cases of

---

legal system, or the profession, and when there is **little or no likelihood of repetition,** the court or disciplinary counsel should consider imposing an admonition. A private sanction in such cases informs the lawyer that his or her actions are unethical, but does not unnecessarily stigmatize a lawyer from whom the public needs no protection. To deter other lawyers, the court can still issue a public report describing the facts in cases where admonitions are imposed, but omitting the names of the disciplined lawyer[ ].

*ABA Standard* 1.2 cmt. (emphasis added).

Recently the ABA retained this approach. A 1992 ABA Report urged full disclosure, triggered by the complainant's initial communication with a disciplinary agency, in all cases of lawyer disciplinary proceedings. The ABA House of Dele-

gates rejected this report, instead opting to preserve existing ABA policy regarding disclosure and confidentiality of disciplinary proceedings. *See ABA's New Discipline Goals Resist Greater Openness,* 8 Laws.Man. on Prof.Conduct (ABA/BNA) 14, 15 (Feb. 12, 1992).

19. The public disclosure in this Opinion of the billing misconduct of the Respondent exposes for the reflection of practicing lawyers the recurring law practice problems of slavish adherence to hourly billing and lack of candor in disbursements—which are of concern to the Court. *See* ABA Standing Comm. on Ethics and Professional Responsibility, Formal Op. 379 (1993) (billing practices).

similar misconduct. *See, e.g., Barrett,* 630 A.2d 652. To deviate now from the pattern of past cases would be wrong.

In choosing to impose a public sanction in this case, the Court takes cognizance of Respondent's argument that there may be a chilling effect on the reporting of misconduct in the future. It is, of course, the duty of professional colleagues to correct and report unethical practices of another. DLRPC 8.3(a). The Court commends the Respondent's partners in both the Firm and the Prior Firm for honoring their ethical obligations and reporting the Respondent's unethical conduct. By highlighting the professionalism and integrity of Respondent's partners, the Court hopes to foster the fulfillment of the ethical duty of prompt and voluntary reporting of ethical breaches by those in positions to know of their occurrence. *See ABA Standards* Preface (noting that one of the most significant problems in the disciplinary system is the overall reluctance of lawyers and judges to report misconduct). In the instant case, Respondent's own partners dutifully and promptly reported the misconduct to the ODC, at the risk of the Firm incurring additional liability and reduced credibility in the eyes of present clients, potential clients, and the public. Their conduct was in the highest tradition of the professionalism for which the Delaware Bar has a notable and honorable national reputation.

## VI. CONCLUSION

The circumstances of this case are unique. The Court has not heretofore been presented with the precise choice here. On the facts presented, however, we hold that anonymity coupled with the Permanent Retirement Sanction will not adequately advance the interests of the lawyer disciplinary system. We have therefore determined that the Respondent should publicly be suspended from the practice of law for a period of three years, ameliorated as noted in the Judgment because of Respondent's voluntary withdrawal from practice since December 31, 1991. Accordingly, **THE JUDGMENT OF THIS COURT IS AS FOLLOWS:**

(1) Respondent shall be prohibited and suspended from engaging in the practice of law for an aggregate period of three years.

(2) In recognition of Respondent's voluntary withdrawal from practice commencing in December of 1991, however, Respondent shall be eligible to apply for reinstatement upon a showing of compliance with the conditions set forth in paragraph (5) hereof.

(3) During the suspension, Respondent shall conduct no act directly or indirectly constituting the practice of law (including the sharing or receipt of any legal fees).

(4) Respondent shall comply with the provisions of Rule 24 of the Rules of the Board on Professional Responsibility.

(5) As a condition of reinstatement, Respondent must comply with the following:

(a) He shall complete an additional six (6) hours of continuing legal education in ethics and professionalism, over and above his presently mandated hours, prior to applying for reinstatement, and shall report his completion of such work to the Office of Disciplinary Counsel.

(b) He shall complete an additional six (6) hours of continuing legal education in law office management.

(c) He shall establish to the satisfaction of the Board and this Court by clear and convincing evidence his professional rehabilitation, fitness and competence to practice law, and that the resumption of the practice of law will not be detrimental to the administration of justice. That showing must include a recognition by Respondent of the wrongfulness of his conduct and appropriate remorse.

(d) He shall pay the costs of the Office of Disciplinary Counsel for this disciplinary proceeding, as well as any other costs incurred in seeking reinstatement.

(6) This Opinion shall be disseminated by Disciplinary Counsel in accordance with Rule 3 and Rule 14 of the Rules of the Board on Professional Responsibility.