In the Matter of a Member of the Bar of the Supreme Court of Delaware:

**Fred BARAKAT, Respondent.**

No. 397, 2013.

Supreme Court of Delaware.

Submitted: Sept. 18, 2013.
Decided: Dec. 11, 2013.

Patricia Bartley Schwartz, Esquire, Office of Disciplinary Counsel, Wilmington, Delaware.

Fred Barakat, Esquire, Wilmington, Delaware.

Before HOLLAND, BERGER and JACOBS, Justices.

PER CURIAM:

Pending before us is an attorney disciplinary proceeding. Fred Barakat, Esquire, was found to have failed to maintain a bona fide office for the practice of law in Delaware, and to maintain adequate books and records as required by the Delaware Lawyers' Rules of Professional Conduct (the "Rules"). In a Report dated July 25, 2013, the Board on Professional Responsibility of the Supreme Court of Delaware (the "Board") found that Barakat's course of conduct violated Rules 1.5(f), 1.15(a), 1.15(d), 3.4(c), 8.1(a), 8.4(c), and 8.4(d). Barakat maintains that his conduct has not violated the Rules, and objects to the Board's findings on both factual and legal grounds. The Office of Disciplinary Counsel ("ODC") does not object to the Board's Report, which recommends that Barakat be suspended for two years.

We find that, with respect to Counts I through V, and VII through XII of the ODC Petition, Barakat's objections lack merit. Regarding Count VI, we find the record not sufficiently developed to support the Board's finding of a violation,[1] and thus dismiss that Count. We, therefore, adopt the Board's findings on Counts I through V and VII through XII. Lastly, we independently determine that Barakat should be suspended from the practice of law for two years, as the Board recommended.

### *Facts* [2]

Barakat has been a member of the Delaware Bar since 1992.[3] Since January 2005, Barakat's address of record with this Court has been 901 North Market Street, Suite 460, in Wilmington, Delaware. Barakat also works from his home in Chadds Ford, Pennsylvania.[4]

Barakat's 901 North Market Street office is not an "office" in the traditional sense. Barakat's lease does not include any designated office space that is exclusively his. Rather, the employees of the landlord collect Barakat's mail and greet any visitors Barakat may have.[5] The building security guards direct visitors to the fourth floor, where a receptionist is stationed during normal business hours.[6] Under this arrangement, Barakat is enti-

---

1. The Board addressed Count VI in only a conclusory manner that, because of the lack of analysis, gives us nothing of substance to review.

2. Barakat's objections to the facts, if any, are addressed in the Analysis, *infra*.

3. Report of the Board on Professional Responsibility, Board Case No. 2012–0019–B (July 25, 2013), at 3 (Bd. Rep.); Amended Resp. to Petition, para. 1 (Am. Resp.).

4. Bd. Rep. at 4; Am. Resp., paras. 1, 6.

5. Bd. Rep. at 4; Tr. at 32, 43–44, 60.

6. Bd. Rep. at 4; Tr. at 43–44.

tled, for additional fees, to rent a conference room or office space, and utilize secretarial, reproduction, facsimile, word processing, and shipping services.[7]

The landlord's billing records (the "Occupant Ledger"), and the testimony of two employees who work on the fourth floor, evidence that Barakat's presence at 901 North Market Street is "sporadic and unscheduled."[8] The Occupant Ledger reflects that in 2010, Barakat rented conference space approximately three times in April, four times in May, twice in June, once in both September and October, and twice in November.[9] This pattern of use continued through August 2012.[10] In October 2011, Barakat informed the United States Internal Revenue Service ("IRS") that "all of [his] work aside from meeting clients, court room appearances and depositions are conducted at [his] home [in Pennsylvania]," and that he has no employees at his Wilmington office.[11]

In 2005, the ODC inquired about Barakat's compliance with Supreme Court Rule 12, which requires Delaware attorneys to maintain a "bona fide" office for the practice of law in Delaware.[12] By letter dated May 5, 2005, the ODC informed Barakat of the requirements of Rule 12.[13] Barakat responded to that letter on May 6, 2005. There is no evidence, however, that he responded to the ODC's later (May 17, 2005) request for additional information.[14]

In 2010, the ODC renewed its inquiry into Barakat's Rule 12 compliance. Barakat responded by letter dated December 19, 2010, asserting that advances in technology enabled him to handle client matters effectively, despite his lack of presence in the Wilmington office.[15] The ODC again reminded Barakat that Rule 12 requires, at a minimum, a " 'responsible person acting on [your] behalf'—i.e., accountable and answerable to you, by employment or by contract."[16] On July 2, 2011, Barakat sent the ODC a letter, asserting, *inter alia*, that he had four employees in his Wilmington office and that he would be present in the Wilmington office "some portion of … 3 days per week, most weeks."[17] Based on that representation, the ODC dismissed the investigation with a formal warning, stating that its purpose was "to directly inform and educate [Barakat] as to conduct which … has raised

---

7. Bd. Rep. at 5; ODC Ex. 8.

8. Bd. Rep. at 9; ODC Ex. 10; Tr. at 49–50, 56–57.

9. Barakat also incurred charges for other, undated use of a conference room. Bd. Rep. at 9; ODC Ex. 10.

10. Bd. Rep. at 9–10; ODC Ex. 10.

11. Bd. Rep. at 7–8; ODC Ex. 17.

12. SUPR. CT. R. 12(d) defines a "bona fide" office as an office where the "attorney practices by being there a substantial and scheduled portion of time during ordinary business hours in the traditional work week. An attorney is deemed to be in an office even if temporarily absent from it if the duties of the law practice are actively conducted by the attorney from that office. An office must be a place where the attorney or a responsible person acting on the attorney's behalf can be reached in person or by telephone during normal business hours and which has the customary facilities for engaging in the practice of law. A bona fide office is more than a mail drop, a summer home which is unattended during a substantial portion of the year or an answering, telephone forwarding, secretarial or similar service."

13. Bd. Rep. at 5; ODC Ex. 1.

14. Bd. Rep. at 6.

15. *Id.;* ODC Ex. 4.

16. Bd. Rep. at 6; ODC Ex. 5.

17. Bd. Rep. at 7; ODC Ex. 6.

professional concerns."[18]

Barakat's books and records were first reviewed in 2008 by the firm of Master, Sidlow, the auditors for the Lawyers' Fund for Client Protection (the "LFCP"). That compliance audit, which covered the six month period ending December 31, 2007, revealed that Barakat's "books and records were deficient based upon his failure to prepare bank reconciliations or client subsidiary ledgers and the inability to prove cash receipt entries to deposit totals."[19] In a letter dated July 7, 2008, Barakat assured the LFCP that the "deficiencies noted in the report have been corrected and the books are now and will continue to be properly maintained."[20]

In February 2012, after a judicial referral alerting the ODC to possible professional misconduct, Bryan Morgan, a senior Master, Sidlow accountant, performed a second compliance audit covering the six month period ending December 31, 2011. Mr. Morgan's 2011 Audit Report concluded that Barakat's books and records practices were irregular.[21]

After the February 2012 audit, the ODC requested an in-depth, forensic audit of Barakat's books and records for the period January 1, 2008 through December 31, 2011. Mr. Joseph McCullough, who conducted that audit, found similar deficiencies in Barakat's bookkeeping practices, including not reporting or improperly recording fees received in cash, depositing most retainer fees directly into his operating account, commingling personal funds into the operating account, and failing to prepare monthly bank reconciliations or client subsidiary ledgers.[22] Indeed, Barakat's accounts and records were in such disarray that McCullough was unable to complete the audit.[23] During the Board proceedings, Barakat admitted that he "pockets" cash retainers, rarely deposits retainers he receives into his escrow account, commingles personal funds in his operating account, and does not maintain bank reconciliations.[24]

### Procedural Background

The ODC filed a Petition for Discipline with the Board on October 10, 2012. The Petition alleged twelve Counts of Rules violations "arising out of (1) a failure by Respondent to meet the requirements of a bona fide office for the practice of law in Delaware, (2) misrepresentations by Respondent regarding whether he maintains a bona fide office, (3) books and records deficiencies, (4) mishandling of client funds, and (5) misrepresentations by Respondent on his Supreme Court Certificates of Compliance from 2008 to 2012."[25] The Petition alleged that this conduct violated Rules 1.5(f), 1.15(a), 1.15(d), 3.4(c), 8.1(a), 8.4(c), and 8.4(d).[26]

18. ODC Ex. 7.

19. Bd. Rep. at 10–11; ODC Ex. 26.

20. Bd. Rep. at 11; ODC Ex. 27.

21. Bd. Rep. at 11–13; ODC Ex. 28. The 2011 Audit Report noted that Barakat did not maintain monthly bank reconciliations; cash receipt entries could not be proved to deposit totals; Barakat's retainer agreements did not state that the "fee is refundable if not earned;" and that Barakat deposited retainers directly into the operating account, or personally retained cash retainers. In addition, Barakat incorrectly answered four questions in his 2011 Certificate of Compliance (to this Court) regarding his books and records practices.

22. Bd. Rep. at 14; ODC Ex. 29.

23. *Id.*

24. Bd. Rep. at 15; Tr. at 319, 338, 347, 365.

25. Bd. Rep. at 3; Petition for Discipline.

26. *Id.*

Barakat filed a Response to Petition for Discipline on October 25, 2012, and an Amended Response on October 31, 2012.[27] The Board held a hearing on February 12, 2013, at which Ms. Patricia Fry Cox and Ms. April Yanacek,[28] as well as Messrs. Bryan Morgan and Joseph McCullough, the auditors, testified. Barakat also testified.[29]

After the hearing, the Board granted two motions by Barakat to supplement the record. The ODC and Barakat both submitted written closing submissions on March 22, 2013, and on April 4, 2013 both parties submitted written replies. The Board issued its findings and recommendations in a report dated July 25, 2013 (the "Board Report"). The Board concluded that the ODC had established by clear and convincing evidence all twelve Counts of the Petition, and recommended that a two-year suspension be imposed.[30]

### ANALYSIS

 This Court has the "inherent and exclusive authority to discipline members of the Delaware Bar."[31] Although Board recommendations are instructive, we are not bound by them.[32] We review the record independently to determine whether there is substantial evidence to support the Board's factual findings.[33] We review the Board's conclusions of law de novo.[34]

### I. Bona Fide Office

 Under Count I, the Board concluded that Barakat violated Rule 3.4(c) by "knowingly disobeying an obligation under the rules of a tribunal to maintain a bona fide office in Delaware."[35] Barakat advances several weak objections to that finding.

First, he argues that that finding is barred by res judicata and collateral estoppel because of the May 5, 2005 and May 17, 2005 letters he received from the ODC that (he alleges) acquiesced in his office arrangements.[36] Addressing Barakat's Motion in Limine, the Board correctly concluded that the bona fide office issue had not yet been adjudicated, and that the "Supreme Court's final order will be the first adjudication of the bona fide office issue to which the principles of res judicata and/or collateral estoppel may apply."[37]

27. A supplement to the original response was received by the Board on November 5, 2012, and a supplement to the amended response was received on February 11, 2013.

28. Ms. Fry Cox is a property manager for 901 N. Market Street, and Ms. Yanacek is an assistant to Ms. Fry Cox. Both work on the fourth floor of the building and Ms. Yanacek sits in the center of the fourth floor lobby. Tr. at 24–25, 54.

29. Bd. Rep. at 1–3.

30. Id. at 20–29, 37.

31. In re Martin, 2011 WL 2473325, at *3 (Del. June 22, 2011) (citing In re Abbott, 925 A.2d 482, 484 (Del.2007)).

32. Id.

33. Id.

34. Id.

35. Bd. Rep. at 21; SUPR. CT. R. 12(d); PROF. COND. R. 3.4(c).

36. Respondent's Obj. at 9–10. Barakat filed a Motion in Limine prior to the hearing to bar the testimony of April Yanacek and Patty Fry Cox based on the same theory. Bd. Rep. at 2.

37. Bd. Rep. at 20. Barakat's reliance on Betts v. Townsends, Inc., 765 A.2d 531 (Del. 2000), and City of Newark v. Unemployment Ins. Appeal Bd., 802 A.2d 318 (Del.Super.Ct.2002) is misplaced. Both cases dealt with administrative bodies that had adjudicated claims. Moreover, in both cases the court held that the principles of collateral estoppel and res judicata did not apply.

Second, Barakat argues that he meets the requirements of Supreme Court Rule 12, because he is reachable by phone, and, therefore, has complied with the Rule.[38] The Rule requires that the *office* "be a place where the attorney or a responsible person acting on the attorney's behalf can be reached in person or by telephone," and have "the customary facilities for engaging in the practice of law."[39] Barakat's July 2, 2011 letter to the ODC undermines his claim that being reachable by phone is sufficient under Rule 12. Were (remote) phone access sufficient, Barakat would have had no reason to represent that he was present three days per week and that a paralegal was present two days per week.[40]

Finally, Barakat appears to suggest that Supreme Court Rule 12, as interpreted by the ODC, imposes an unconstitutional residency requirement, and violates the commerce clause of the United States Constitution.[41] That claim is unsupported. Barakat cites *Tolchin v. Supreme Court of the State of N.J.*, a case that involved a challenge of New Jersey's bona fide office requirement. In *Tolchin*, the Third Circuit held that the requirement violated neither the commerce clause, nor the privileges and immunities clause, nor the equal protection clause.[42]

■ With respect to Counts II and III, the Board found that Barakat violated Rule 8.1(a) "by knowingly making a false statement in connection with a disciplinary matter," and also Rule 8.4(c),[43] "by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation when he informed the ODC he was meeting the requirement to maintain a bona fide office for the practice of law in Delaware."[44] Barakat claims that his July 2, 2011 letter was neither knowingly false nor dishonest or fraudulent, because when he wrote the letter, his court schedule and record of bank deposits showed that he was in Delaware approximately 12–15 days per month.[45] Even if Barakat was in his "office" three days per week, that does not cure his misrepresentations about his staff in the Wilmington office and their activities managing his practice.[46]

Regarding Count IV, the Board found that Barakat violated Rule 8.4(d) by "engaging in conduct that is prejudicial to the administration of justice by failing to maintain a bona fide office for the practice of law in Delaware."[47] Although Barakat objects generally to all of the Counts, he

---

38. Respondent's Obj. at 33.

39. Supr. Ct. R. 12(d).

40. Bd. Rep. at 7; ODC Ex. 6.

41. Respondent's Obj. at 30–31, 34–35. Barakat also argues that the days that he is in court in Delaware should be counted toward his presence in the office. However, it is unclear how presence in court constitutes presence in the office. Barakat has admitted that "aside from stopping at the office prior to court, or to pick up mail," he goes to the office only "to meet clients by appointment." ODC Ex. 16.

42. *Tolchin v. Supreme Court of the State of N.J.*, 111 F.3d 1099 (3d Cir.1997).

43. The Board Report refers to Rule 8.3(c). However, the language following the rule is that of 8.4(c).

44. Bd. Rep. at 21.

45. Respondent's Obj. at 38–39. He claims that a change in fortune—a failure to sign new Delaware clients—caused him to be absent from the office for the remainder of 2011.

46. Bd. Rep. at 7, 23; ODC Ex. 6.

47. Bd. Rep. at 21–22.

advances no specific argument regarding this particular one. Therefore, the finding is conceded.

It is clear from the record that the Board's findings on Counts I–IV are supported by substantial evidence.

## II. Accounting Misconduct

Counts V through X are based on Barakat's books and records practices, including the safeguarding of client funds. V and VI are based on Barakat's dealings with a particular client (Giles). VII through X charge general violations.[48]

As for Counts VII through X, the Board concluded, based on the findings of the audits conducted by Messrs. Morgan and McCullough, that Barakat had violated Rules 1.5(f) (Count VII),[49] 1.15(a) (Count VIII),[50] 1.15(d)(3) (Count IX),[51] and 1.15(d) (Count X).[52] Barakat objects to the admission of the 2011 Audit Report, Mr. McCullough's Audit Report, and the testimony of both Mr. Morgan and Mr. McCullough.[53] Barakat claims that the testimony and reports lack scientific valid-

ity under both Delaware Rule of Evidence 705 and the standard established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[54] Messrs. Morgan and McCullough are both experienced auditors who are very familiar with the auditing procedures of the LFCP.[55] Morgan has performed "approximately one hundred Rule 1.15 and 1.5(f) compliance audits for the LFCP using the standard procedure and following the outline developed by LFCP...."[56] Morgan testified that when conducting his compliance audit of Barakat, he followed LFCP's standard procedure.[57] McCullough is an experienced accounting professional who spent thirty years as a special agent in the criminal division of the IRS specializing in white collar crime and financial record-keeping.[58] He has also performed approximately two hundred forensic audits, and between fifty and sixty audits for the LFCP.[59]

■ Barakat also contends that he has maintained his records and accounts in

48. Bd. Rep. at 26–28.

49. As for Count VII, the Board found that by "depositing unearned advance fees into his operating account, and by providing written retainer agreements that fail to state the advance 'fee is refundable if [it] is not earned,' [Barakat] violated Rule 1.5(f)." *Id.* at 27.

50. As for Count VIII, the Board found that by "depositing unearned advance fees into his operating account, [Barakat] failed to safeguard client funds in violation of Rule 1.15(a)." *Id.*

51. As for Count IX, the Board found that by "commingling personal funds into his attorney operating account, [Barakat] violated Rule 1.15(d)(3)." *Id.*

52. As for Count X, the Board found that by "(1) retaining advance fees for personal use and not depositing them into any account, (2) not proving cash receipt entries to deposit

totals, (3) depositing unearned advance fees directly into his operating account, (4) not preparing monthly bank reconciliations, and (5) not preparing reconciled client subsidiary ledgers, [Barakat] failed to abide by the requirements for maintaining his books and records in violation of Rule 1.15(d)." *Id.* at 28.

53. Respondent's Obj. at 5–7.

54. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

55. Bd. Rep. at 26.

56. *Id.;* Tr. at 110.

57. Tr. at 110.

58. Tr. at 180–81.

59. Bd. Rep. at 26; Tr. at 182.

compliance with the Rules.[60] Barakat's primary argument is that he complied with the Comments to Rule 1.5 and that the auditors erroneously failed to account for those Comments in their audits. Barakat specifically relies on Comments 10 and 12.[61] Comment 10 provides in relevant part that:

> Some smaller fees—such as those less than $2500.00—may be considered earned in whole upon some identified event, such as upon commencement of the attorney's work on that matter.... Nevertheless, all fees *must be reasonable such that even a smaller fee might be refundable, in whole or in part, if it is not reasonable under the circumstances.*[62]

Comment 12 is substantially similar. It provides that in certain contexts, such as bankruptcy representation, fees greater than $2500 may be deemed earned upon the occurrence of a particular event.[63]

First, these Comments do not mean what Barakat claims they do. By their plain language, the Comments do not authorize an attorney to deposit any fee under $2500 automatically into his operating account (which Barakat admitted is his practice).[64] By the Comments' own terms,

if an attorney receives an advance fee of less than $2500, of which he earns a portion upon commencing work, *the unearned portion of the advance fee must still be placed in a fiduciary account.*[65] Even if (counterfactually) the Comments could be read to condone Barakat's accounting practices, the Preamble to the Rules clearly states that the Comments are not authoritative and are meant only for interpretive guidance.[66]

■ Regarding his retainer agreements (at issue in Count VII), Barakat argues that he satisfied Rule 1.5(f) because his agreements state that a portion of the retainer is "non-refundable" at a certain point.[67] Although one might infer from this that the balance of the retainer is refundable, Rule 1.5(f) requires an explanation that *unearned* fees are refundable. Barakat's retainer agreement does not explain that unearned fees are refundable.

The audit reports and the testimony of Morgan and McCullough establish that the Board's findings on Counts VII–X are supported by substantial evidence.

Count VI charges Barakat with failing to deposit an advance fee from his client, Giles, into his trust account.[68] Barakat objects to this Count. The record on

---

60. A difficulty in evaluating Barakat's objections arises from the general disarray of Barakat's accounts and records. Both auditors testified that the lack of standard records made it difficult to get a clear sense of exactly what was happening with Barakat's accounts. In fact, McCullough could not finish the audit. Tr. at 115–123, 191.

61. Respondent's Obj. at 7, 20.

62. PROF. COND. R. 1.5, Comment 10, (emphasis added).

63. *Id.,* Comment 12.

64. Bd. Rep. at 27; Respondent's Obj. at 20.

65. Although Barakat asserted at certain points that his retainer fee in bankruptcy

cases is earned at his initial consultation with a client, he also stated that a portion of his bankruptcy retainer is not refundable once the bankruptcy petition is substantially prepared, and that the remainder of the retainer is not refundable upon the petition's filing. That explanation of his bankruptcy fees, and his bankruptcy retainer agreement, undermine Barakat's claim that the bankruptcy retainer fee is fully earned at the initial consultation. Respondent's Obj. at 16–17.

66. PROF. COND., preamble, para. 21.

67. Respondent's Obj. at 17.

68. Bd. Rep. at 25.

Count VI is unclear and undeveloped. Barakat claims that Giles paid him $800 upon the signing of a bankruptcy fee agreement (dated April 16, 2008),[69] which "basically covered the work [he] had done that day."[70] The Board Report does not adequately address Barakat's claim that he earned the fee *that same day.*[71] We therefore conclude that the Board's findings on this Count are not supported by substantial evidence.

## III. Certification Statements

Counts XI and XII charge false statements made by Barakat on his 2008–2012 Certificates of Compliance. Barakat certified that (i) "[a]ny and all fiduciary funds held are maintained in an attorney trust/escrow account;" (ii) "[c]heck register balances are reconciled monthly to bank statement balances;"[72] (iii) "[w]ith respect to attorney trust/escrow account(s), there is a client subsidiary ledger maintained with monthly listings;" and (iv) "[w]ith respect to attorney trust/escrow account(s), the reconciled end-of-month cash balance agrees with the total of the client balance listing of the client subsidiary ledger."[73] The Board concluded that Barakat did not follow any of these procedures, should have so reported, and therefore violated Rules 8.4(c) and 8.4(d).[74] We agree.

In his objection to the Board Report, Barakat points to (allegedly) exonerating statements made by the auditors during cross-examination.[75] This objection lacks merit. The testimony to which Barakat points is either in response to hypothetical questions that assume the Comments to Rule 1.5 (as interpreted by Barakat) govern, or is cited out of context.[76] Moreover, Messrs. Morgan and McCullough were called to testify about their respective audits, not to offer legal opinions.

## IV. Sanctions

■ This Court follows the ABA standards for imposing lawyer sanctions. "The ABA framework consists of four key factors to be considered by the Court: (a) the ethical duty violated; (b) the lawyer's mental state; (c) the extent of the actual or potential injury caused by the lawyer's misconduct; and (d) aggravating and mitigating factors."[77]

Regarding the first three factors, the Board found that Barakat had violated duties owed to clients, the legal system and the legal profession. The Board also concluded, that based on the history of interactions with the ODC, Barakat was aware of his obligations to maintain a bona fide office in Delaware and to maintain his books and records in accordance with the Rules. Although no actual harm to clients was demonstrated, the Board concluded that Barakat's failure to maintain adequate books and record presented a serious risk of harm to clients.[78]

---

69. Respondent's Obj. at 23.

70. Tr. at 314.

71. Bd. Rep. at 17. The Board relies on the language in the fee agreement that states that "the full fee must be paid prior to filing." *Id.*

72. In his 2008 and 2012 Certificates of Compliance, Barakat responded "N/A" to this question.

73. Bd. Rep. at 18–19; ODC Exs. 39–43.

74. *Id.* at 18–19, 28–29.

75. Respondent's Obj. at 21–22, 26–27.

76. *See, e.g.,* Tr. at 230–31, 239, 245, 252–54.

77. *In re Bailey,* 821 A.2d 851, 866 (Del.2003) *reinstatement granted,* 842 A.2d 1244 (Del. 2004) (citing *In re Lassen,* 672 A.2d 988, 998 (Del.1996)).

78. *See In re Benson,* 774 A.2d 258, 262 (Del. 2001) ("[E]ven though Benson's violations did not result in any injury to her clients, her careless record keeping certainly had the potential to cause injury because of the difficulty

In determining the appropriate sanctions for Barakat, the Board identified six aggravating factors—dishonest or selfish motive, a pattern of misconduct, multiple offenses, the submission of false and/or misleading statements, an unwillingness to admit the wrongful nature of his conduct, and substantial experience in the practice of law—and only two mitigating factors— absence of a prior disciplinary record, and Barakat's cooperative attitude.[79]

Barakat argues that the two year suspension recommended by the Board is disproportionate to the adjudicated violations. He points to *In re Doughty,* as support for a more lenient punishment.[80] Although that case involved similar violations, this Court found that Mr. Doughty had "negligently" engaged in the misconduct, had no dishonest motive, and had engaged in "timely, good faith remedial efforts." [81] The factors supporting relative leniency in Doughty's case are simply not present in Barakat's case.

### CONCLUSION

For the reasons stated above, we adopt the terms of the Board's recommendation with respect to Counts I–V, and Counts VII–XII, and dismiss Count VI. It is hereby ordered that Barakat be disciplined as follows:

1. Barakat hereby is immediately suspended from the practice of law in this State for a period of two years;

2. During the period of suspension, Barakat must fully cooperate with the ODC in its efforts to monitor his compliance with the suspension order and shall not: (a) have any contact directly or indirectly constituting the practice of law, including the sharing or receipt of legal fees, except that Barakat is entitled to any legal fees earned prior to the date of this order; (b) share in any legal fees earned for services by others during such period of suspension. Barakat also shall be prohibited from having any contact with clients or prospective clients or witnesses or prospective witnesses when acting as a paralegal, legal assistant, or law clerk under the supervision of a member of the Delaware Bar;

3. The Office of Disciplinary Counsel (ODC) shall file a petition in the Court of Chancery for the appointment of a Receiver for Barakat's law practice pursuant to Rule 24 of the Delaware Lawyers' Rules of Disciplinary Procedure; the Receiver shall provide notice to clients, adverse parties, and others as required by Rule 23 of the Delaware Lawyers' Rules of Disciplinary Procedure; and the Receiver shall make such arrangements as may be necessary to protect the interests of any of Barakat's clients and the public;

4. Barakat shall cooperate in all respects with the Receiver, including providing him/her with all law office books and records;

5. Barakat shall promptly pay the costs of the disciplinary proceedings in accordance with the Delaware Lawyers' Rules of Disciplinary Procedure when presented with a statement of costs by the ODC;

---

in ascertaining that all client funds in fact were being properly maintained.").

**79.** Bd. Rep. at 33–35. The Board noted that the two mitigating factors were partially negated by the years-long span of Barakat's wrongful conduct, and by Barakat's false and misleading statements to the ODC.

**80.** *In re Doughty,* 832 A.2d 724 (Del.2003). Doughty was publicly sanctioned and placed on probation for two years.

**81.** *Id.* at 736.

6. As reinstatement is not automatic, should Barakat apply for reinstatement, any such application must be made pursuant to Rule 22 of the Delaware Lawyers' Rules of Disciplinary Procedure following the suspension period; and

7. This Order shall be disseminated by the ODC as provided in Rule 14 of the Delaware Lawyers' Rules of Disciplinary Procedure.

