IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware: | § § § § § | No. 477, 2017 |
| **ANDRE M. BEAUREGARD**, | § § § | |
| Respondent. | § § | |

Submitted: April 11, 2018
Decided: June 5, 2018

Before **STRINE**, Chief Justice; **VALIHURA**, and **SEITZ**, Justices.

Upon Review of the Report of the Board on Professional Responsibility.
**RECOMMENDATION ACCEPTED IN PART. SIX MONTH SUSPENSION IMPOSED WITH CONDITIONS.**

Jennifer-Kate Aaronson, Esquire, Chief Disciplinary Counsel, Office of Disciplinary Counsel, Wilmington, Delaware.

Myron T. Steele, Esquire, and Ryan C. Cicoski, Esquire (*argued*), Potter Anderson & Corroon LLP, Wilmington, Delaware, for Respondent.

**PER CURIAM:**

The Office of Disciplinary Counsel ("ODC") filed a petition for discipline against Andre Beauregard, Esquire, the managing partner of his law firm, Brown, Shiels & Beauregard, LLC, for failing to maintain the books and records of his law firm as required by the Delaware Lawyers' Rules of Professional Conduct. The ODC also charged Mr. Beauregard with filing an inaccurate 2015 Certificate of Compliance. After a hearing, a panel of the Board submitted a Report and Recommendation finding that Mr. Beauregard violated Delaware Lawyers' Rules of Professional Conduct 1.15(a), 1.15(d), 5.3(c), 8.4(c), and 8.4(d). The Panel recommended a public reprimand and a two-year probation with conditions.

Mr. Beauregard did not file objections to the Report and Recommendation. The ODC filed objections, claiming the Board erred by considering Mr. Beauregard's mental state for what the ODC argues are strict liability offenses, and misinterpreted Rules 1.15(a) and 8.4(c) leading to erroneous conclusions for several of the alleged books and records violations. The ODC also objected to the Board's recommended sanction. According to the ODC, after considering Mr. Beauregard's earlier public reprimand for similar violations and his knowledge of the current violations, suspension for not less than one year, instead of a public reprimand, is the proper sanction.

With the exceptions explained later, we accept the Board's findings regarding violations of Rules 1.15(a), 1.15(d), 5.3(c), 8.4(c), and 8.4(d). The record supports the Board's conclusion that Mr. Beauregard, as the managing partner of his law firm: (a) did not exercise reasonable supervision over non-lawyer employees charged with keeping the law firm's books and records; (b) knew of books and records violations and did not take reasonable action to correct them; and (c) incorrectly certified in 2015 his law firm's compliance with the rules.

As for the ODC's objections, first, we agree with the ODC that Rule 1.15, does not contain a state of mind requirement. But, we agree with the Board that, in Mr. Beauregard's case, he supervised non-lawyers managing the law firm's accounting functions. Under Rule 5.3, he is responsible for Rule 1.15 recordkeeping violations when, as the supervising lawyer, he fails to make reasonable efforts to ensure that the non-lawyers performing accounting functions comply with the rules. Further, as a supervising lawyer who knows of books and records rule violations and fails to take reasonable remedial action to correct errors, he violates Rule 5.3 and is responsible for the law firm's Rule 1.15 violations. Mr. Beauregard failed on both fronts.

We also agree with the ODC that, under Rule 1.15(a), Mr. Beauregard failed to safeguard client property as provided by the Rule. Although the Board's interpretation of the rule—that "other property" does not include client funds—is

3

not unreasonable, we believe that the Rule, when read as a whole, includes as violations a lawyer's or law firm's failure to account for all client funds.

As for Rule 8.4(c)—engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation—and 8.4(d)—conduct prejudicial to the administration of justice—we agree with the ODC that the Rule's focus is on conduct. But, under Rule 8.4(c) the conduct involves dishonesty, fraud, deceit or misrepresentation, all words that imply a state of mind requirement. Rule 8.4(d), however, does not require any specific underlying conduct or imply a state of mind. Thus, we agree with the Board's findings that Mr. Beauregard knew when he signed and submitted a Certificate of Compliance containing inaccuracies, he violated Rule 8.4(c). Mr. Beauregard also violated Rule 8.4(d) when he filed the inaccurate Certificate of Compliance with the Court, regardless of his state of mind.

And finally, following our independent review, we agree with the ODC that suspension is the presumptive sanction and should be imposed instead of a public reprimand. We impose a six-month suspension with conditions.

## I.

The Court accepts the facts as found by the Board, most of which were undisputed. Admitted to the Delaware Bar in 1986, Mr. Beauregard practices primarily as a criminal defense attorney in Kent and Sussex Counties. He represents

4

private clients and those assigned to him by the Office of Defense Services when conflicts arise.

In 2005, Mr. Beauregard, as the managing partner of his prior law firm, admitted violating Rules 1.15(a), 1.15(b), 1.15(c), 5.3, and 8.4(c).[1] Like here, Mr. Beauregard failed to maintain real estate account records, failed to supervise non-lawyer employees, and filed inaccurate certificates of compliance with the Court. The Court reprimanded Mr. Beauregard publicly and imposed a three-year probation period with conditions. In 2008, Mr. Beauregard completed his probationary period successfully, and the ODC closed the 2005 disciplinary complaint.

Mr. Beauregard formed a new law firm in 2012, Brown, Shiels & Beauregard, LLC, and served as its managing partner. Having been through the earlier disciplinary proceedings, Mr. Beauregard knew that he was required to keep the law firm's records in compliance with Rule 1.15, and that he was responsible to report compliance with Rule 1.15 accurately on the law firm's annual Certificate of Compliance.[2] In addition, having been sanctioned previously for errors by non-

---

[1] *In re Beauregard*, 886 A.2d 1277, 2005 WL 2883669 (Del. Oct. 24, 2005) (TABLE) ("Beauregard engaged in a pattern of misconduct. He failed to maintain his law office books and records in accordance with the Rules from October 2000 through January 2004. He failed to supervise his employee bookkeeper from October 2000 through January 2004. And he failed to accurately represent the status of his books and records on his Certificates of Compliance filed with the Court for the years 2001, 2002, and 2003.").

[2] Tr., *In re Beauregard*, No. 112702-B, at 74–75 (Del. Bd. Prof'l Resp. Mar. 23, 2017) (Q. "[Y]ou understood in 2012, when you became managing partner of the new firm that was formed, . . . that you had an obligation to safeguard client funds under Rule 1.15(a), correct?" A. "Correct.").

lawyer employees responsible for keeping the firm's financial records, he understood his supervisory responsibility to ensure these employees complied with Rule 1.15.[3]

At his new firm, Mr. Beauregard employed Joseph O'Donnell, who had a Ph.D. in business administration and previously worked at other law firms. Mr. O'Donnell was responsible for the firm's accounting records, except for the real estate accounts. Even though Mr. Beauregard knew the importance of Rule 1.15 recordkeeping requirements and the need to supervise non-lawyer employees performing accounting functions, he only generally reviewed Rule 1.15 with Mr. O'Donnell.[4] Mr. Beauregard did review on a monthly basis the client subsidiary records for the firm's trust accounts, which listed the funds allocated to over sixty clients. That review could not have been done with any precision, however, because each month from November 2014 to April 2015, these records showed negative balances for four to five clients.[5] Mr. Beauregard discussed these negative client balances with Mr. O'Donnell, who stated that they were a "glitch in the program,"

---

[3] *Id.* at 73–74 ("After the first incident that was experienced back in 2005 . . . , I had a better awareness of what was expected.").

[4] *Id.* at 83–84 (Q. "But you did not sit down with Mr. O'Donnell and specifically review Rule 1.15, correct?" A. "I didn't go line by line on Rule 1.15. But I told him the requirements that had to be done based upon that rule . . . ." Q. "You did not send him for any specific training on Rule 1.15, correct?" A. "I did not."); *id.* at 96–97 ("I had a gut feeling he was an honest person and that he was competent because he had a doctoral degree and that if he didn't know, he would find out.").

[5] The negative amounts ranged from -$7,039.05 to -$8,039.05. *See* Joint Ex. 15 (Indep. Accountants' Report, at 2 (Sept. 18, 2015)).

but that they "had nothing to do with money being missing."[6] Mr. Beauregard did, however, identify them as "red flags"[7] but did not investigate them further. Mr. O'Donnell later testified that he investigated the negative balances and found "they were actually overpayments made, and we had money that had to be taken back from the client."[8]

Mr. Beauregard hired Luke O'Brien to manage the law firm's books and records for the firm's real estate account,[9] and retained Thomas Sombar, CPA, to handle the firm's tax filings. Mr. Beauregard asked Mr. Sombar to perform a precertification audit for the 2015 Certificate of Compliance, but Mr. Sombar declined, explaining he had not taken a necessary course.[10] Mr. Beauregard did not seek a precertification audit from anyone else. On February 25, 2015, he filed a 2015 Certificate of Compliance with this Court, certifying that his law firm's books and records complied with Rule 1.15.

In March 2015, a client filed a complaint with the ODC because she received two $1,000 checks from Mr. Beauregard's firm attempting to refund a $1,000 balance remaining on a retainer. Upon receiving the complaint, Mr. Beauregard suspended Mr. O'Donnell and hired two new bookkeepers to audit the books. They

---

[6] Tr., at 84–87.
[7] *Id.* at 85.
[8] *Id.* at 204–05.
[9] Mr. O'Donnell testified that he "looked at" the real estate account, but "did not review it in detail." *Id.* at 200.
[10] *Id.* at 135.

7

found that no money was missing and that there were sufficient other funds in the account to cover the negative balances.

In September 2015, the Lawyers' Fund conducted a Rule 1.15 compliance audit of the law firm's books and records. The report from the Fund's accountant found thirteen instances of noncompliance:[11]

(1)    Multiple client balances included earned fees and expense reimbursements the firm should have removed, and two accounts were incorrectly identified as Interest on Lawyer Trust Accounts ("IOLTA");

(2)    The firm failed to list a non-fiduciary account that had closed;

(3)    The firm did not maintain all books and records necessary for a non-fiduciary and a real estate account;

(4)    The general ledger balance for a non-fiduciary account did not match the monthly adjusted bank balance;[12]

(5)    A closed non-fiduciary account was incorrectly titled;

(6)    The firm did not prepare monthly bank reconciliations for a closed non-fiduciary account;

(7)    A fiduciary account was not an IOLTA account;

(8)    A check drawn from a fiduciary account was outstanding for over two years;

(9)    A fiduciary account's end-of-month cash balance did not match the total client funds held;[13]

(10)    A fiduciary account had negative client balances each month;[14]

---

[11] Joint Ex. 15 (Indep. Accountants' Report).
[12] The differences ranged from -$9,196.39 to $1,533,220.88. *Id.* at 2.
[13] The differences ranged from $195.81 to $781.06. *Id.*
[14] The differences ranged from $7,039.05 to $8,039.05. *Id.*

8

(11) A fiduciary account had multiple old balances, some of which were earned fees and expense reimbursements the firm should have removed;

(12) The real estate account did not have monthly bank reconciliations; and

(13) The real estate account did not have monthly client listings.

After the audit, Mr. Beauregard addressed the deficiencies, hired an in-house and an outside bookkeeper, upgraded the firm's accounting software, increased the time spent supervising the non-lawyer employees, and hired an accounting firm to complete Rule 1.15 compliance audits quarterly.

## II.

Following the Rule 1.15 compliance audit, the ODC filed a petition for discipline on September 7, 2016, alleging that Mr. Beauregard violated Rules 1.15(a), 1.15(d), 5.3, 8.4(c), and 8.4(d). Mr. Beauregard admitted to violating Rule 1.15 as to certain inaccuracies revealed in the 2015 Audit, but denied the remaining charges.

The Board held a combined liability and sanction hearing on March 23, 2017. After finding that the parties appeared to agree that none of the rules Mr. Beauregard allegedly violated provide for strict liability, but instead require a state of mind of negligence or worse,[15] the Board made the following findings:

---

[15] R. & R., *In re Beauregard*, No. 112072-B, at 14 (Del. Bd. Prof'l Resp. Nov. 19, 2017).

9

**Rule 1.15(a)**

- Mr. Beauregard did not violate Rule 1.15(a) as to the negative account balances, because client funds do not fall within the definition of "other property" that must be safeguarded under Rule 1.15(a).[16] In addition, the Board found that "[a] negative client balance ledger . . . does not mean that the funds of the particular client with the negative balance have not been safeguarded."[17] Rather, because Mr. Beauregard did not misuse the funds, he did not violate Rule 1.15(a) due to the negative balances.

- Mr. Beauregard violated Rule 1.15(a) by failing to prepare monthly client listings and reconciliations, the absence of which he would have discovered through the exercise of reasonable care.[18]

**Rule 1.15(d)**

- Mr. Beauregard did not violate Rule 1.15(d)(12)(E) as to a check that was outstanding for two years, because the ODC did not present clear and

---

[16] *Id.* at 16–17. The Board defined "other property" as "client property other than funds." *Id.*; *see* Del. Lawyers' R. Prof'l Conduct 1.15(a) ("Other property shall be identified as such and appropriately safeguarded.").

[17] R. & R., at 16–18.

[18] *Id.* at 18–19; *see* Del. Lawyers' R. Prof'l Conduct 1.15(a) ("Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after the completion of the events that they record.").

convincing evidence about "what [the firm's] response was" after discovering it.[19]

- Mr. Beauregard violated Rule 1.15(d)(12)(D) because the end-of-month cash balance did not agree with the total client funds held in the time period reviewed, of which he would have been aware through reasonable diligence.[20]

- Mr. Beauregard violated Rule 1.15(d)(12)(C) because he did not address the negative balances in client accounts over a six-month period.[21]

- Mr. Beauregard violated Rule 1.15(d)(12)(G) because he was aware of multiple accounts containing earned fees and expense reimbursements the firm failed to transfer from the account.[22]

---

[19] R. & R., at 21; *see* Del. Lawyers' R. Prof'l Conduct 1.15(d)(12)(E) ("If a check has been issued in an attempt to disburse funds, but remains outstanding (that is, the check has not cleared the trust or escrow bank account) six months or more from the date it was issued, a lawyer shall promptly take steps to contact the payee to determine the reason the check was not deposited by the payee, and shall issue a replacement check, as necessary and appropriate.").

[20] R. & R., at 21–22; *see* Del. Lawyers' R. Prof'l Conduct 1.15(d)(12)(D) ("The reconciled total cash balance must agree with the total of the client or third party balance listing. There shall be no unidentified client or third party funds. The bank reconciliation for a fiduciary account is not complete unless there is agreement with the total of client or third party accounts.").

[21] R. & R., at 22; *see* Del. Lawyers' R. Prof'l Conduct 1.15(d)(12)(C) ("No funds disbursed for a client or third party must be in excess of funds received from that client or third party.").

[22] R. & R., at 22–23; *see* Del. Lawyers' R. Prof'l Conduct 1.15(d)(12)(G) ("No funds which should have been disbursed shall remain in the account, including, but not limited to, earned legal fees, which must be transferred to the lawyer's non-fiduciary account on a prompt and timely basis when earned.").

- Mr. Beauregard violated Rule 1.15(d)(12)(H) because the firm did not prepare monthly bank reconciliations or monthly client listings for the real estate account.[23]

- Mr. Beauregard did not violate 1.15(d) by failing to preserve the books and records account for five years, because the contention was that he failed to create one in the first place.[24]

- Mr. Beauregard violated Rule 1.15(d)(3) by incorrectly titling a bank account, and reasonable diligence would have identified the error.[25]

- Mr. Beauregard violated Rule 1.15(d)(8) by failing to prepare monthly bank reconciliations for the law firm's operating account, which reasonable diligence would have detected.[26]

---

[23] R. & R., at 23–24; *see* Del. Lawyers' R. Prof'l Conduct 1.15(d)(12)(H) ("When a separate real estate bank account is maintained for settlement transactions, and when client or third party funds are received but not yet disbursed, a listing must be prepared on a monthly basis showing the name of the client or third party, the balance due to each client or third party, and the total of all such balances. The total must agree with the reconciled cash balance.").

[24] R. & R., at 23–24; *id.* at 24 ("[The] ODC clarified that it was not contending that Mr. Beauregard's firm had failed to preserve records, but that it had failed to create them in the first place . . . . There is no additional violation of Rule 1.15(d)."); *see* Del. Lawyers' R. Prof'l Conduct 1.15(d) ("A lawyer . . . shall preserve the books and records for at least five years following the completion of the year to which they relate, or, as to fiduciary books and records, five years following the completion of that fiduciary obligation.").

[25] R. & R., at 24; Del. Lawyers' R. Prof'l Conduct 1.15(d)(3) ("Bank accounts and related statements, checks, deposit slips, and other documents maintained for non-fiduciary funds must be specifically designated as 'Attorney Business Account' or 'Attorney Operating Account,' and must be used only for funds held in a non-fiduciary capacity.").

[26] R. & R., at 25; *see* Del. Lawyers' R. Prof'l Conduct 1.15(d)(8) ("The check register balance for each bank account must be reconciled monthly to the bank statement balance.").

Mr. Beauregard violated Rule 1.15(d)(8) because the general ledger balance for an operating account did not agree with the adjusted bank balance.[27]

## Rule 5.3(c)

- Mr. Beauregard violated Rule 5.3(c) by failing to take reasonable remedial action to prevent Mr. O'Donnell from permitting deficiencies to exist in the books and records.[28]

## Rule 8.4(c)

- Mr. Beauregard violated Rule 8.4(c) for misrepresentations in the 2015 Certification of Compliance regarding the earned fees and expenses that should have been removed from the trust accounts.[29]

- Mr. Beauregard violated Rule 8.4(c) for misrepresentations in the 2015 Certification of Compliance regarding the failure to maintain books and records for the real estate account; and regarding the general ledger balance that did not agree to the adjusted bank balance.[30]

---

[27] R. & R., at 25.

[28] *Id.* at 26; *see* Del. Lawyers' R. Prof'l Conduct 5.3(c) ("[A] lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: . . . (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.").

[29] R. & R., at 27; *see* Del. Lawyers' R. Prof'l Conduct 8.4(c) ("It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . .").

[30] R. & R., at 27, 29–30.

- Mr. Beauregard did not violate Rule 8.4(c) regarding the outstanding check or the omission of a non-fiduciary operating account—because there was no evidence he was aware of them or that reasonable care would have revealed them;[31] nor the two accounts not labeled as IOLTA accounts— because the bank statements did not show that any interest was deposited into them.[32]

### Rule 8.4(d)

- Mr. Beauregard violated Rule 8.4(d) by filing a Certificate of Compliance containing misrepresentations, which is "prejudicial to the administration of justice."[33]

The Board next addressed sanctions using the framework from the American Bar Association's Standards for Imposing Lawyer Sanctions.[34] The Board found Mr. Beauregard violated Rules 1.15(a), 1.15(d), 5.3(c), 8.4(c), and 8.4(d), acting knowingly by failing to remove the earned fees and expense reimbursements from the fiduciary account, and negligently in all other respects. As to injury, the Board found the inaccurate Certificate of Compliance caused actual injury to the legal

---

[31] *Id.* at 28–29.

[32] *Id.*

[33] *Id.* at 30–31 (quoting Tr., at 247); *see id.* at 31 ("An attorney violates 8.4(d) by filing an inaccurate certification with the Court with respect to compliance with Rule 1.15." (citing *In re Wilson*, 886 A.2d 1279, 2005 WL 3485738, at * 9 (Del. Nov. 9, 2005) (TABLE))); Del. Lawyers' R. Prof'l Conduct 8.4(d) ("It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice . . . .").

[34] ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS 3.0 (1991).

system, but found the Rule 1.15 violations did not cause actual or potential injury because the law firm had sufficient funds to cover the negative balances. In considering aggravating factors, the Board found that Mr. Beauregard's prior discipline and substantial experience counted against him; however, the Board found the prior discipline was dissimilar and remote in time from the current conduct. The Board also considered the mitigating factors of Mr. Beauregard's lack of a dishonest motive, good faith effort to remedy the violations, cooperation and full disclosure with the Board, and positive character evidence. The Board concluded that a public reprimand and two-year probation with various conditions was the appropriate sanction.

## III.

We review the Board's factual findings to determine whether the record contains substantial evidence to support those findings.[35] The Board's conclusions of law are reviewed *de novo*.[36] After our independent review, we find the Board's factual findings are supported by the record, as are the Board's ultimate conclusions that Mr. Beauregard violated Rules 1.15(a), 1.15(d), 5.3(c), 8.4(c), and 8.4(d). Thus, we accept the Board's recommendations regarding rule violations. Although we

---

[35] *In re Brewster*, 587 A.2d 1067, 1069 (Del. 1991).
[36] *Id.*

have accepted the Board's violation findings in this difficult case, we agree with the ODC that the Board erred in some respects, as explained next.

*A.*

In its Report and Recommendation, the Board found that "[n]one of these Rules provides for strict liability, each requires a state of mind of negligence or worse."[37] In other words, each of the Rule violations charged in the proceeding required the Board to assess Mr. Beauregard's state of mind before finding a violation. The ODC objects to this conclusion, claiming that unless a Rule has an express state of mind requirement, the default standard is strict liability—meaning a Rule has been violated regardless of the respondent's mental state. According to the ODC, a respondent's state of mind is relevant only to the sanction imposed, not to whether a rule violation has occurred.

We understand the Board's confusion about the issue, given what the Board thought was agreement by the parties on the state of mind issue.[38] Whether the absence of a mental state requirement in some of our rules implies a strict liability

---

[37] R. & R., at 14.

[38] The confusion over the state of mind requirement stems from a discussion between the Board and counsel during the hearing. *See* Tr., at 12–14 (stating in response to a question from the Board about mental state being a defense to the Rule violations, "[w]ith respect to the finding of the violation of any of the counts, the plain language of the rules don't have a mental state. So it could be a finding of negligence, knowing or intentional, with respect to the violation itself. In essence, Rule 1.15 is a strict liability, as well as the other counts, because it accounts for negligence being the mental state."). From this somewhat ambiguous colloquy, the Board assumed that mental state was an element of a Rule violation, as well as the sanction to be imposed.

standard for those rules has not been addressed by our Court and is the subject of debate under the Model Rules.[39] Although we have as a reference the commentary and reports accompanying the rules at both the national and state levels, the best that can be gleaned from those resources is the purposeful addition of a state of mind requirement to some rules, and its absence from others.[40] Lacking pre-adoption guidance on the state of mind issue, we look to the plain language of each rule and

---

[39] *See* Nancy J. Moore, *Mens Rea Standards in Lawyer Disciplinary Codes*, 23 GEO. J. LEGAL ETHICS 1 (2010) (advocating criminal law mental state standards and a presumption against strict liability in disciplinary rules); GEOFFREY C. HAZARD, JR. & WILLIAM HODES, THE LAW OF LAWYERING § 1.23 (4th ed. 2014) ("[M]ost of the obligations imposed by the Model Rules of Professional Conduct or set out in the Restatement of the Law Governing Lawyers involve a level of cognition by a lawyer. . . . Many other rules do not expressly refer to a cognitive element but necessarily depend upon one."); *id.* § 1.24 (explaining that choices concerning cognitive requirements in the rules were "purposeful, and intended to make a difference in close cases that depend on the lawyer's state of mind"); *see also* Restatement (Third) of the Law Governing Lawyers, § 5 cmt. d (2000) ("Some few offenses, such as those requiring maintenance of office books and records . . . are absolute in form, thus warranting a finding of a violation if the requirement is not met, no matter what the lawyer's state of mind.").

[40] The ABA's Ethics 2000 Commission, which evaluated the Model Rules and prepared a report of proposed amendments, recommended adding a *mens rea* requirement to some rules, but rejected adding it to others. *See* Margaret Colgate Love, *The Revised ABA Model Rules of Professional Conduct: Summary of the Work of Ethics 2000*, 15 GEO. J. LEGAL ETHICS 441, 446–69 (2002) (listing the rules the commission discussed but rejected adding a *mens rea* requirement); PREAMBLE AND SCOPE, REPORTER'S EXPLANATION OF CHANGES, at 60 (Aug. 2000) (listing the rules the Commission recommended adding a *mens rea* requirement). The Commission did not discuss, however, whether strict liability would apply to the rules without a *mens rea* requirement. *See* Carl A. Pierce, *Variations on a Basic Theme: Revisiting the ABA's Revision of Model Rule 4.2 (Part II)*, 70 TENN. L. REV. 321, 385 (2003) ("I have heard no support . . . from the Ethics 2000 Scienter Committee that . . . 'there should be a presumption against including a *mens rea* requirement in a rule.' With respect to the no-contact rule, this presumption fell prey to the Committee's view that 'there should be a presumption against changing existing scienter provisions in the rules absent a compelling justification.'"); Moore, *supra* note 39, at 15 ("[T]here is virtually no evidence that current rules without explicit mental state requirements were purposefully adopted as strict liability rules.").

interpret the rules as "rules of reason" and "with reference to the purposes of legal representation and of the law itself."[41]

*B.*

*Rules 1.15, 5.3, 8.4, and State of Mind*

Rule 1.15 requires a lawyer to protect client property through detailed books and records requirements. As noted in the comments to Rule 1.15, "[a] lawyer should hold property of others with the care required of a professional fiduciary."[42] The Rule's purpose is plain—to put financial recordkeeping requirements in place that track to the penny all funds and property received and disbursed by the lawyer or law firm, and to ensure that client funds are accounted for and kept separate from all other funds.[43]

Rule 1.15 does not have a mental state requirement. But, that does not mean that every technical violation merits the ODC's involvement or a disciplinary proceeding. In a case like this, when a lawyer did not keep the books and records

---

[41] Del. Lawyers' R. Prof'l Conduct, Scope § 14; *see also* Moore, *supra* note 39, at 25 ("In the absence of clear evidence of the drafters' intent, courts should make judgments 'informed by the values, policies, and practical considerations which guided the drafters of the [rules] in the first instance' and should be cognizant of 'the purposes of the particular rule and the underlying concepts of the law of lawyering.'") (first quoting Bruce A. Green, Doe v. Grievance Committee: *On the Interpretation of Ethical Rules*, 55 BROOK. L. REV. 485, 537 (1989), then quoting HAZARD & HODES § 1.23 (3d ed. 2003 Supp.)).

[42] Del. Lawyers' R. Prof'l Conduct 1.15 cmt. 1.

[43] *See In re Guy*, 625 A.2d 279, 1993 WL 169154, at *3 (Del. Apr. 26, 1993) (TABLE) ("Rule 1.15 requires that clients' funds be kept separate from a lawyer's own funds; that 'complete records' of such funds be maintained; and that clients' funds be promptly delivered upon entitlement.").

but instead hired a non-lawyer to perform the function, Rule 5.3 must be read with Rule 1.15.  Under Rule 5.3, Responsibilities Regarding Non-Lawyer Assistants:

> With respect to a nonlawyer employed or retained by or associated with a lawyer:
>
> (a) a partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.[44]

Rule 5.3 contains "reasonable" and "reasonableness" standards of care, as well as a "knowing" state of mind requirement.  Our Court in *In re Bailey* explained how these standards of care and state of mind bear on the supervising lawyer's responsibilities: "Although a managing partner cannot guarantee absolutely the integrity of the firms books and records, it is the managing partner's responsibility

---

[44] Del. Lawyers' R. Prof'l Conduct 5.3.

to implement reasonable safeguards to ensure that the firm is meeting its obligations with respect to books and records."[45] Further, when there has been a "sustained and systematic failure"[46] by a managing partner to supervise a firm's employees to ensure compliance with Rule 1.15, such conduct "may not be characterized as simple negligence."[47] Thus, when a supervising lawyer fails to meet their obligations under Rule 5.3, and books and records violations have been proven under Rule 1.15, the supervising lawyer is responsible for those violations.

The Board properly took into account Mr. Beauregard's state of mind to decide whether, as managing partner, he put reasonable supervisory procedures in place or knew of violations and took prompt remedial actions to ensure the violations were corrected. We agree with the Board's conclusion that Mr. Beauregard was at least negligent in overseeing Mr. O'Donnell and Mr. O'Brien to ensure the books and records were maintained in compliance with Rule 1.15, and that he knew of Rule 1.15 violations due to the negative balances in the account and failed to take prompt remedial action to correct them.[48] Thus, the Board correctly found that Mr. Beauregard violated Rule 5.3(c) and Rule 1.15.

---

[45] *In re Bailey*, 821 A.2d 851, 865 (Del. 2003).

[46] *Id.* (quoting *In re Caremark Int'l Derivative Litig*, 698 A.2d 959, 971 (Del. Ch. 1996)).

[47] *Id.* In *In re Bailey*, the Supreme Court referred to the standards of care and state of mind in the context of Rule 5.1, addressing supervision of attorneys. *Id.* at 865 n.31. The same principles are at work when supervising non-lawyers under Rule 5.3.

[48] *See* HAZARD & HODES § 47.07 ("Rule 5.3(c)(2) imposes an enhanced duty upon partners and lawyers with direct supervisory authority over nonlawyer personnel—they can be held liable for failing to interdict or to rectify consequences of misconduct that they know about . . . .").

Turning to Rule 8.4(c) and (d), they do not contain express state of mind requirements:

It is professional misconduct for a lawyer to: . . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice . . . .[49]

The ODC argues that the Rule's focus is on conduct, and not state of mind. As to Rule 8.4(c), however, this distinction is one without a difference. The specific conduct referred to in Rule 8.4(c)—dishonesty, fraud, deceit or misrepresentation—implies a state of mind requirement. In other words, a lawyer knows that their conduct is something other than truthful, accurate, or forthright, but engages in the conduct anyway. Here, the Board found that Mr. Beauregard knew of rule violations, but nonetheless filed an inaccurate 2015 Certificate of Compliance with the Court. Thus, the Board properly found that Mr. Beauregard violated Rule 8.4(c) by making misrepresentations to the Court.

In contrast, Rule 8.4(d) focuses purely on the conduct, and not any specific underlying deceptive activity.[50] Thus, state of mind does not enter into a rule

---

[49] Del. Lawyers' R. Prof'l Conduct 8.4(c), (d).

[50] *See*, *e.g.*, *In re Conduct of Claussen*, 909 P.2d 862, 870 (Or. 1996) ("The focus of the rule is on the *effect* of a lawyer's conduct on the administration of justice, rather than on the lawyer's state of mind when the conduct is undertaken."); *In re Witt*, 583 N.E.2d 526, 532 (Ill. 1991) (finding that state of mind and standard of care are irrelevant to the rule prohibiting conduct prejudicial to the administration of justice).

violation under Rule 8.4(d). Mr. Beauregard's conduct—submitting a 2015 Certificate of Compliance containing misrepresentations—violated Rule 8.4(c) and (d).[51]

\* \* \*

In summary, by violating Rule 5.3, Mr. Beauregard is responsible for the law firm's Rule 1.15 violations—failing to prepare monthly client listings and reconciliations; failing to reconcile the end-of-month cash balances with total client funds; failing to address the negative client balances; failing to remove earned fees and expenses from fiduciary accounts; incorrectly titling an operating account; and failing to reconcile the operating account's general ledger balance with the monthly bank statement balance.[52] Mr. Beauregard also violated Rule 8.4(c) and (d) by filing

---

[51]*See In re Member of Bar Castro*, 160 A.3d 1134, 2017 WL 1376411, at \*5 (Del. Apr. 12, 2017) (TABLE) ("The Delaware Supreme Court relies upon the representations made by attorneys in the Certificates of Compliance filed each year in the administration of justice governing the practice of law in Delaware. By filing with the Delaware Supreme Court in 2013, 2014, and 2015 Certificates of Compliance which included misrepresentations relating to the Respondent's maintenance of her law practice books and records, the Respondent violated Rule 8.4(d)."); *In re Woods*, 143 A.3d 1223, 1131 (Del. 2016) ("An attorney violates Rule 8.4(d) by filing an inaccurate certification with the Court with respect compliance with Rule 1.15."); *In re Witherell*, 998 A.2d 852, 2010 WL 2623704, at \*5 (Del. June 30, 2010) (TABLE) (admitting that submitting certificates of compliance containing misrepresentations violated Rule 8.4(c) and (d)); *In re Stull*, 985 A.2d 391, 2009 WL 4573243, \*5 (Del. Dec. 4, 2009) (TABLE) (same).

[52] We agree with the Board's finding that Mr. Beauregard did not violate Rule 1.15(d) for failing to "preserve" records, because the actual contention by the ODC was that he failed to create them in the first place. The ODC has also challenged the Board's findings that Mr. Beauregard did not know about a client check that had been outstanding for over two years, as well as a separate bank account that was not disclosed in the law firm's certificate of compliance, and therefore he could not be held responsible for those errors. Although the Board's findings on these issues are not material to the outcome of this proceeding, we note that the reasonable care requirement of Rule 5.3 extends to a pre-filing detailed review and discussion with the law firm's accounting

22

with the Court a Certificate of Compliance that misrepresented the law firm's compliance with Rule 1.15.

## C.

### *Rule 1.15(a) and Client Funds*

Under Rule 1.15(a), a lawyer must "safeguard" a client's property:

Rule 1.15. Safekeeping property

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account designated solely for funds held in connection with the practice of law in this jurisdiction. Such funds shall be maintained in the state in which the lawyer's office is situated, or elsewhere with the consent of the client or third person. Funds of the lawyer that are reasonably sufficient to pay bank charges may be deposited therein; however, such amount may not exceed $1,000 and must be separately stated and accounted for in the same manner as clients' funds deposited therein. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after the completion of the events that they record.[53]

The Board parsed the language of the statute and focused on the specific sentence referring to "other property" and "appropriately safeguard[ing]" that other property. According to the Board, the safeguarding qualifier of that sentence refers

---

professionals to ensure that the law firm's certificate of compliance is accurate. It is possible that a detailed review would have alerted Mr. Beauregard to these issues, and he could have taken prompt remedial action to correct them.

[53] Del. Lawyers' R. Prof'l Conduct 1.15.

only to "other property," and "other property" refers to property other than client funds. Thus, the Board concluded, Mr. Beauregard did not violate Rule 1.15(a) because he only failed to safeguard client funds—not "other property" of his clients.[54]

The Board's interpretation of the rule is not unreasonable. But, we think it focuses too narrowly on the one sentence and gives insufficient weight to the subsection read as a whole. The title of the Rule is "Safekeeping Property," which does not differentiate between money and other property of clients.[55] The Rule's requirements—to hold money separate from the lawyer's own property; maintain the funds in the state where the lawyer's office is situated or elsewhere by consent; and keep complete records for a period of five years—are all aimed at safeguarding both client funds and other property. We have long held that a lawyer or law firm fails to safeguard a client's funds when he fails to comply with Rule 1.15(a).[56]

---

[54] Further, according to the Board, the failure to safeguard money is dealt with by subsection (d) of Rule 1.15. *See id.* 1.15(d) (listing provisions that the maintenance of the books and records must comply with).

[55] HAZARD & HODES § 20.02 ("Rule 1.15(a) concerns the handling and safekeeping of property *or funds* belonging to another person . . . .") (emphasis added); *id.* ("Rule 1.15 requires lawyers to safeguard and keep separate from their own funds property entrusted to them by another person . . . .").

[56] *See In re Member of Bar Castro*, 2017 WL 1376411, at *5 (finding that negative client balances violated Rule 1.15 as a failure to safeguard client funds); *In re Malik*, 167 A.3d 1189, 2017 WL 2893921, at *3 (Del. July 7, 2017) (TABLE) (same); *In re Member of Bar Gray*, 152 A.3d 581, 2016 WL 7188110, at *4 (Del. Dec. 9, 2016) (TABLE) (same); *In re Spiller*, 696 A.2d 398, 1997 WL 328600, *4–5 (Del. May 29, 1997) (TABLE) (same); *cf. In re Otlowski*, 976 A.2d 172, 2009 WL 1796083, at *4 (Del. June 23, 2009) (TABLE) (finding a violation of Rule 1.15 when an escrow balance did not match the subsidiary listing of client balances and there were negative

Further, even though the Board found that funds were available from other sources sufficient to fill the hole left by the negative balances, this Court has never treated funds in a lawyer's or law firm's trust account as fungible. The covering funds relied on by the Board should not have been considered a substitute for negative balances in the client subsidiary ledger.[57] Each client account is treated as a separate account, even if the funds are commingled in a trust account. The law firm had a duty of safeguarding its clients' property—including funds—by complying with Rule 1.15(a), and it failed to do so. As a managing partner who failed to supervise non-attorney employees, Mr. Beauregard is responsible for those deficiencies.

---

client balances and outstanding checks); *In re Stull*, 2009 WL 4573243, *4 (finding a violation of Rule 1.15 when Respondent failed to transfer earned attorneys' fees from his escrow account to his operating account and failed to discover and correct negative client balances); *In re Becker*, 947 A.2d 1120, 2008 WL 187942, at *10 (Del. Jan 15, 2008) (TABLE) (finding a violation of Rule 1.15 when the respondent disbursed funds "in an amount greater than the amount being held for clients and third parties, thereby creating negative client balances").

[57] *See In re Member of Bar Castro*, 2017 WL 1376411, at *7 (finding a potential injury existed because "funds might not have been available under different circumstances or a client might not have realized that the unearned portion of the fee was refundable"); *In re Member of Bar Gray*, 2016 WL 7188110, at *5–6 (same); *In re Benson*, 774 A.2d at 262 ("Moreover, even though Benson's violations did not result in any injury to her clients, her careless record keeping certainly had the potential to cause injury because of the difficulty in ascertaining that all client funds in fact were being properly maintained."); *In re Nowak*, 5 A.3d 632, 2010 WL 3699843, at *8 (Del. Sept. 22, 2010) (TABLE) (finding potential injury when there were discrepancies between the cash available in escrow accounts and the escrow balances); *In re Figliola*, 652 A.2d 1071, 1076 (Del. 1995) (finding it irrelevant whether the attorney "always had sufficient funds to cover" the use of his client's funds, but "[r]ather, the issue is whether [he] should have taken a client's money without proper authorization").

IV.

We turn to the Board's recommended discipline of a public reprimand with conditions. The Board considered the four factors set forth in *In re Bailey* using the ABA Standards for Imposing Lawyer Sanctions: (a) the ethical duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused; and (d) aggravating and mitigating factors.[58] The Board found:

- Mr. Beauregard violated Rules 1.15(a), 1.15(d), 5.3(c), 8.4(c), and 8.4(d);

- Mr. Beauregard acted knowingly in failing to remove the earned fees and expense reimbursements from the fiduciary account and acted negligently in all other respects;

- Mr. Beauregard filed an inaccurate Certificate of Compliance that caused "actual injury to the legal system because the Supreme Court relies on their accuracy."[59] But, the Board also found that there was no actual or potential injury because "the Firm always had sufficient funds on hand to cover any client obligations," and thus there was "no evidence that any clients were ever at risk of their funds being unavailable";[60]

- Mitigating factors existed—Mr. Beauregard's lack of dishonest or selfish motive, timely and good faith effort to rectify the violations, full and free

---

[58] *In re Bailey*, 821 A.2d at 866.
[59] R. & R., at 32.
[60] *Id.* at 33.

26

disclosure to the ODC, cooperative attitude toward the proceedings, favorable character and reputation evidence, and the remoteness of the prior offenses;[61] and

- Aggravating factors existed—Mr. Beauregard's prior discipline and substantial experience.[62]

Although the Board took into account Mr. Beauregard's prior discipline, the Board found that Mr. Beauregard successfully completed his probation, his prior violations were remote in time, and "his current conduct falls very far short of the kind of conduct that warranted suspension" in comparative cases.[63] Thus, the Board concluded that the appropriate sanction was a public reprimand and two-year probation with conditions.

*A.*

The Supreme Court has the inherent and exclusive authority to discipline members of the Bar.[64] Although the Board's recommendation is valued and helpful, we are not bound by it.[65] "In determining an appropriate sanction, this Court must 'protect the interests of the public and the [B]ar while giving due consideration to

---

[61] *Id.*

[62] *Id.* at 34.

[63] *Id.* at 42; *see also id.* at 35.

[64] *In re Green*, 464 A.2d 881, 885 (Del. 1983).

[65] *In re Koyste*, 111 A.3d 581, 588 (Del. 2015); *see also In re Nadel*, 82 A.3d 716, 720 (Del. 2013) ("Our role is to review the record independently and determine whether there is substantial evidence to support the Panel's factual findings.").

the interests of the individual involved.'"[66]  Disciplinary proceedings are not intended to be punitive.  Instead, the primary purpose is "to protect the public"[67] and to "foster public confidence in the Bar, to preserve the integrity of the profession, and to deter other lawyers from similar misconduct."[68]  "Of significant weight in determining the appropriate sanction . . . is the impact the chosen sanction will have on the preservation of the integrity of the Bar and the public's perception of the Bar."[69]

When fixing a sanction, we are guided by the ABA Standards for Imposing Lawyer Sanctions and our prior precedents.[70]  After considering the first three factors, we decide the presumptive sanction.  Mitigating and aggravating factors are then considered to determine whether we should depart from the presumptive sanction.[71]

---

[66] *In re Tos*, 610 A.2d 1370, 1372 (1992) (citation omitted); *see also* ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS, Preface (1991) (listing such relevant policy considerations as "protecting the public, ensuring the administration of justice, and maintaining the integrity of the profession").

[67] ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS 1.1 cmt. (1991).

[68] *In re Tos*, 610 A.2d at 1373 (citing *In re Sullivan*, 530 A.2d 1115, 1119 (Del. 1987)).

[69] *See also In re Lassen*, 672 A.2d 988, 998 (Del. 1996).

[70] *In re Barrett*, 630 A.2d 652, 656 (Del. 1993); *In re Christie*, 574 A.2d 845, 853 (Del. 1990).

[71] *In re Howard*, 765 A.2d 39, 42 (Del. 2000) ("In making an initial determination of an appropriate sanction, the Court begins by examining three key factors: (a) the ethical duty violated; (b) the lawyer's mental state; and (c) the extent of the actual or potential injury caused by the lawyer's misconduct.  After weighing these three factors and making an initial determination of an appropriate sanction, the Court then will look at the aggravating and mitigating circumstances of the particular case to determine if the discipline should be increased or decreased." (citing ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS 2.0 (1991); *In re Reardon*, 759 A.2d 568, 575 (Del. 2000)).

*B.*

In its Report and Recommendation, the Board identified the ethical duties violated (Rules 1.15, 5.3, and 8.4) and characterized Mr. Beauregard's mental state as "knowing" for permitting earned fees and expense reimbursements to remain in the law firm's trust account, but negligent for the other violations. We agree with the ODC that the Board took too narrow a view of Mr. Beauregard's overall mental state for the books and records violations and his inaccurate certificate of compliance. Under the ABA Standards, "knowledge" is "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result."[72] As we said in *In re Bailey*, knowing conduct can be inferred from the circumstances because a person is presumed to intend the natural consequences of their actions.[73] Lawyers cannot stick their heads in the sand and blind themselves to their professional obligations.[74]

---

[72] ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS, Definitions (1991).

[73] 821 A.2d at 863 (citing *In re Lassen*, 672 A.2d at 996 n.9); *see also* HAZARD & HODES § 1.24 ("In the final analysis, all conclusions about someone else's state of mind must be derived from circumstantial evidence.").

[74] HAZARD & HODES § 1.24 ("In terms of what can be proved, the 'knows' standard thus begins to merge with the 'should have known' standard, because it will sometimes be impossible to believe that a lawyer lacked the requisite knowledge, unless he deliberately tried to evade it."); *see id.* § 1.24 n.73 (quoting *United States v. Benjamin*, 328 F.2d 854, 862 (2d Cir. 1964) ("[T]he government can meet its burden [of proving willfulness] by showing that a defendant deliberately closed his eyes to facts he had a duty to see.")).

Here, Mr. Beauregard was previously disciplined for substantially the same books and records violations, and thus should have been in a hyper-vigilant state when he assumed the same supervisory responsibilities at his new law firm.[75] It appears from the record that he did not train his non-lawyer staff properly to comply with the Rule 1.15 requirements, never verified compliance of the law firm's real estate account with Rule 1.15, and, after becoming aware of problems with the fiduciary account balances, took feeble and ineffective steps to bring the account into compliance. Thus, under the overall circumstances, we find Mr. Beauregard acted with a knowing state of mind.

We also agree with the ODC that the Board should have given more weight to the potential injury Mr. Beauregard's violations could have caused the legal system.[76] Books and records violations create a serious risk of harm to clients, third parties, and the public.[77] The inaccurate certificate of compliance, Mr. Beauregard's

---

[75] *See also id.* § 1.24 ("[T]he law takes account of a lawyer's legal training and experience in assessing his state of mind.").

[76] *See id.* § 20.04 ("Similarly, a lack of actual harm to a client typically is not a defense, although it may again serve to mitigate the sanction."); CHARLES W. WOLFRAM, MODERN LEGAL ETHICS 89 n.62, § 3.3.1 (1986) ("The act alone, and not its effects, is critical. The fact that a lawyer's offense did not in fact cause injury to a client or another person does not provide a defense.").

[77] *In re Barakat*, 99 A.3d 639, 647 (Del. 2013) ("Although no actual harm to clients was demonstrated, the Board concluded that Barakat's failure to maintain adequate books and record presented a serious risk of harm to clients."); *In re Witherell*, 2010 WL 2623704, at *8 ("The Panel readily acknowledges no client was harmed by his misconduct. Nonetheless, Respondent's misconduct violated his duties to the legal system and to the profession. Although no actual injury resulted, Respondent's misconduct is significant."); *In re Stull*, 2009 WL 4573243, at *7 ("Respondent's misconduct in this case violated his duties to his clients, to the legal system, and to the profession. Although no actual injury resulted, that does not mean that the risk to the

disregard for negative balances that had been called to his attention, a neglected real estate trust account, and books and records managed by non-lawyers with inadequate training on recordkeeping requirements all contributed to a serious risk of harm to clients and the public. Under ABA Standard 4.12, absent aggravating and mitigating circumstances, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."[78]

Because Mr. Beauregard knew or should have known that he was "dealing improperly with client property," which created potential injury to his clients, we find suspension from the practice of law the presumptive sanction under ABA Standard 4.12.[79] And given Mr. Beauregard's prior discipline for substantially the

---

Respondent's clients in particular and the public in general were insignificant."); *In re Doughty*, 832 A.2d 724, 736 (Del. 2003) ("The failure to fulfill this obligation [to maintain orderly books and records] presents serious risks of harm to a lawyer's clients."); *In re Benson*, 774 A.2d at 262–63 ("A lawyer's duty to maintain proper books and records exists for the purpose of protecting not only the lawyer but the lawyer's clients, and the failure to fulfill that duty presents serious risks to the lawyer's clients, even if no actual harm results.").

[78] ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS 4.12 (1991); *see also* Professor John M. A. DiPippa, *Lawyers, Clients, and Money*, 18 U. ARK. LITTLE ROCK L.J. 95, 99 (1995) ("Even when lawyers are not disbarred for financial misconduct, these violations often result in other severe sanctions. . . . Lawyers who inadvertently or unintentionally commit violations often receive sanctions designed to serve an educational or deterrent function." (citing WOLFRAM, *supra* note 76, at 180; *In re Brooks*, 494 N.W.2d 876, 877 (Minn. 1993)); Jeanne M. Whalen, *Safekeeping Client Property: Why the ABA Is Hands-Off and the States Are Hand-Holding*, 38 U. TOL. L. REV. 1279, 1280 (2007) ("Because trust is so important when lawyers act in a custodial capacity, courts regularly authorize strict sanctions for misconduct in this area.").

[79] *See also* HAZARD & HODES § 20.04 ("When trust account violations are shown to be knowing or intentional, . . . [t]he sanction is almost always a substantial suspension.").

same violations, a presumptive sanction of suspension is especially warranted when

ABA Standard 8.2 is also considered. Under this standard:

> Suspension is generally appropriate when a lawyer has been reprimanded for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.[80]

*C.*

The Board considered the aggravating and mitigating circumstances to increase or decrease the degree of discipline to be imposed. As aggravating circumstances, the Board found Mr. Beauregard's prior disciplinary offenses and substantial experience in the practice of law. In mitigation, the Board found Mr. Beauregard's lack of a dishonest or selfish motive, remedial action taken before and after receiving the 2015 Audit Report, and cooperative attitude with the ODC and its investigation. The Board also placed substantial emphasis on the remoteness of Mr. Beauregard's prior offenses as a mitigating factor.

Although we agree with most of the Board's aggravating and mitigating factors, we place less emphasis on the remoteness of his prior disciplinary offenses. As the ODC points out, there was only a four-year period between Mr. Beauregard's completion of his disciplinary probation period and the misconduct leading to the

---

[80] ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS 8.2 (1991).

violations in this proceeding.[81]  It is hard to imagine remoteness in time to be a factor in repetitive books and records violations.[82]  The recent violations were not minor recordkeeping errors by subordinates.  Client escrow funds were mismanaged.  The real estate trust account was neglected and lacked client subsidiary ledgers to track specific client funds.  Thus, in our view, the aggravating factors outweigh the mitigating factors, and under the ABA Standards, the presumptive sanction of suspension should be imposed.

Our disciplinary cases are consistent with this result.[83]  In *In re Bailey*, this Court suspended the respondent for six months for various books and records and tax violations.  The Court emphasized the "enhanced duties" of a managing partner "to ensure the law firm's compliance with its recordkeeping and tax obligations," which he must discharge "faithfully and with the utmost diligence."[84]  In *Bailey*, the

[81] Resp't's Post-Hr'g Mem., at 6.  Mr. Beauregard completed his probation on November 13, 2008, and the misconduct in this case began in 2012.  Tr., at 234–35.

[82] *See* WOLFRAM, *supra* note 76, at 122, § 3.5.2 ("Known repetition clearly implies incorrigibility. Repeated misconduct after receiving the warning of a sanction short of disbarment can confidently be regarded as an ill omen for compliance in the future.").

[83] *In re Barakat*, 99 A.3d 639 (imposing two-year suspension in part for failing to maintain adequate books and records); *In re Thompson*, 911 A.2d 373 (Del. 2006) (suspending an attorney for three years when knowingly failed to file a tax return, failed to file memoranda to the Family Court for a client, failed to respond to various requests from the ODC, and failed to balance an escrow account, all while on probationary status); *In re Autman*, 798 A.2d 1042, 2002 WL 1227213 (Del. June 3, 2002) (TABLE) (suspending an attorney for three years for various violations, including failure to maintain proper financial records, failure to file tax returns, and filing an inaccurate Annual Registration Statement); *In re Barrett*, 630 A.2d 652 (suspending an attorney for three years for failing to safeguard client property).

[84] *In re Bailey*, 821 A.2d at 853.

Court found that "the Firm's operating account was repeatedly in an overdraft condition," and "[the respondent], as the managing partner, knew or should have known" about the violations.[85] The Court concluded that the respondent showed a "sustained and systematic failure" to supervise his employees and oversee the books and records, resulting in potential harm to his clients and the legal profession.[86] The Court imposed a six-month suspension, even though the respondent had no disciplinary record, made extensive remedial efforts, and cooperated with the proceedings.[87]

In *In re Nowak*, this Court suspended an attorney for one year for failing to safeguard client funds, maintain books and records, supervise non-lawyer employees, and for filing inaccurate Certificates of Compliance.[88] The court noted that Nowak's books and records violations continued even after he was alerted to the violations—supporting the finding of a "sustained and systematic failure" to exercise diligence.[89] The Court found that "[w]hen a lawyer (as is the case here) knows or should know that he is dealing improperly with client property and causing

---

[85] *Id.* at 864.
[86] *Id.* at 866.
[87] The Board explained that the respondent's "position as managing partner and his knowing misconduct, which caused the invasion of client trust funds, distinguish[ed] this case from this Court's prior decisions imposing public reprimands for bookkeeping and related rule violations." *Id.* at 867.
[88] 2010 WL 3699843, at *8.
[89] *Id.* at *7, 12.

injury or potential injury to a client, suspension is generally appropriate under the ABA Standards."[90]  Even though Nowak did not have any disciplinary history, the Court imposed a one year suspension.

V.

Subject to the condition stated below, Mr. Beauregard is suspended from the practice of law for six months beginning July 2, 2018.  During his suspension, Mr. Beauregard shall not practice law or share in any legal fees arising from clients or cases referred by Mr. Beauregard to any other attorney or share in any legal fees earned for services.  Mr. Beauregard may, however, continue to provide criminal defense representation through the Office of Conflicts Counsel.[91]  Following his suspension period, Mr. Beauregard is permanently barred from maintaining his or a law firm's books and records, or acting in a supervisory capacity over the law firm's books and records under Rule 5.3.  Mr. Beauregard shall pay all of the ODC's costs in this proceeding and the costs of the Lawyers' Fund audits, and Mr. Beauregard shall cooperate fully with the ODC in its efforts to monitor his compliance with the suspension order.

---

[90] *Id.* at *8; *see also id.* ("Likewise, suspension is generally appropriate when a lawyer (as is the case here) knows that false statements or documents are being submitted to the Court and takes no remedial action and causes an adverse or potentially adverse effect on the legal system.").

[91] *See In re Pankowski*, 977 A.2d 899, 2009 WL 2044803, at *1 (Del. July 15, 2009) (TABLE), (permitting suspended lawyer to "provide legal services under the supervision of and in connection with the Superior Court Criminal Conflicts Program").